## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| Michael Beaumont,<br>Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>                    v.<br><br>Christopher Paucek, Paul Lalljie, and Matt Norden,<br><br>                              Defendants. | Case No. 8:24-cv-01723-ABA |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

**PAGE**

I.    PRELIMINARY STATEMENT…………………………………………………...1

II.   STATEMENT OF FACTS ........................................................................................ 3

    A.    2U's Business Model and USC Relationship…………………………….…. 3

    B.    The edX Acquisition and "Transition"………………………………….……..3

    C.    Early Signs of Relationship Deterioration……………………………..…….……4

    D.    Internal Awareness of Institutional Dissatisfaction…………………………..4

    E.    edX Transition Stumbles…………………………………………….……5

    F.    "Portfolio Management Activities" in 2022 and 2023………………………….5

    G.    Misleading Representations to Investors……………………...………….……..6

III.  ARGUMENT..................................................................................................... 7

    A.  THE COMPLAINT PLEADS MATERIAL MISREPRESENTATIONS AND OMISSIONS……………………… …………………………………….7

        1.    Statements of past or current facts about the edX acquisition and transition to the platform strategy……………………………………………8

        2.    Statements regarding 2U's relationships with its Partner Institutions and "portfolio management"………………………………….…13

    B.    THE COMPLAINT ADEQUATELY PLEADS SCIENTER……………………19

        3.    Defendants Had Access to and Closely Monitored Developments with 2U's Partner Institutions…………………………………….…19

        4.    Defendants' Own Statements Support a Strong Inference of Scienter………..22

        5.    Partner Relationships Were Critical To 2U's Core Operations………………..25

6.      The edX Platform Was Critical to 2U's Core Operations…………………………………………………………..25

7.      Defendants' Motive Arguments Do Not Add Anything to Scienter Analysis………………………………………………………...26

8.      Defendants' Alternate Inference Is Not More Compelling Than the Complaint's Strong Inference of Scienter……………………………………………..27

C.      THE COMPLAINT PLEADS LOSS CAUSATION…………………………………………………………………29

D.      THE COMPLAINT PLEADS CONTROL PERSON LIABILITY…………………………………………………………………30

IV.     CONCLUSION.................................................................................................... 30

## TABLE OF AUTHORITIES

**PAGE(S)**

### CASES

*Brumbaugh v. Wave Sys. Corp.*,
  416 F. Supp. 2d 239 (D. Mass. 2006) ................................................................... 16

*Burt v. Maasberg*,
  2014 WL 1291834, at *13 (D. Md. Mar. 28, 2014)................................................. 7

*Carlucci v. Han*,
  907 F. Supp. 2d 709 (E.D. Va. 2012) ............................................................. 18, 20

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*,
  2017 WL 11562247, at *4 (D. Md. July 6, 2017)............................................... 9, 10

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ................................................................................ 9

*Davis v. Trans Union LLC*,
  No. 1:24-CV-02338-JRR, 2025 WL 886173  (D. Md. Mar. 21, 2025) .................................... 7

*Dunn v. Borta*,
  369 F.3d 421 (4th Cir. 2004) ................................................................................ 9

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336, 343 (2005)..................................................................................... 30

*Epstein v. World Acceptance Corp.*,
  2015 WL 2365701 (D.S.C. May 18, 2015) .................................................. 7, 16, 27

*Epstein v. World Acceptance Corp.*,
  203 F. Supp. 3d 655 (D.S.C. 2016)............................................................ 12, 20, 28

*Fam. of Care Real Est. Holding Co. v. Chapman Prop., LLC*,
  No. CV DKC 23-0574, 2023 WL 4134427, at *4 (D. Md. June 22, 2023)............................... 7

*Howard v. Haddad*,
  962 F.2d 328 (4th Cir. 1992) ................................................................................ 9

*In re Cable & Wireless, PLC*,
  321 F. Supp. 2d 749 (E.D. Va. 2004) .................................................................. 27

*In re Coventry Healthcare, Inc. Securities Litigation*,
  2011 WL 1230998 (D. Md. Mar. 30, 2011) .......................................................... 21

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013)........................................................... 25

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
  239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002) *aff'd,* 374 F.3d 1015 (11th Cir. 2004)................. 9

*In re Sinclair Broadcast Group, Inc. Sec. Litig.*,
  2020 WL 571724, at *8-9 (D. Md. Feb. 4, 2020), .................................................... 12

*In re StockerYale Sec. Litig.*,
  453 F. Supp. 2d 345 (D.N.H. 2006)....................................................................... 16

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006)................................................................................. 21

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ................................................................................ 24

*Katyle v. Penn Nat'l Gaming, Inc.*,
  637 F.3d 462, 465 (4th Cir. 2011) ................................................................. 28, 29

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
  2016 WL 3981236, at *5 (D.S.C. July 25, 2016) ..................................... 10, 20, 24, 25

*Kiken v. Lumber Liquidators Holdings, Inc.*,
  155 F. Supp. 3d 593 (E.D. Va. 2015) ................................................................ 7, 10

*Latham v. Matthews*,
  662 F. Supp. 2d 441 (D.S.C. 2009)....................................................................... 20

*Lefkoe v. Jos. A. Bank Clothiers*,
  2007 WL 6890353 (D. Md. Sept. 10, 2007) ............................................. 11, 19, 20, 21

*LifeWise Family Fin. Sec. v. Holden (In re Triangle Capital Corp. Sec. Litig.)*,
  988 F.3d 743 (4th Cir. 2021)............................................................................... 26

*Longman v. Food Lion, Inc.*,
  197 F.3d 675 (4th Cir. 1999) ................................................................................ 9

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ............................................................................... 19

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  513 F.3d 702, 711 (7th Cir. 2008) ........................................................................ 24

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ............................................................................................ 27

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004)............................................................................. 21

*Ollila v. Babcock & Wilson Enters., Inc.*,
2018 WL 792069, at \*4 (W.D.N.C. Feb. 8, 2018)....................................................9, 11, 12, 20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)................................................................................ 12

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
353 F.3d 338 (4th Cir. 2003) ................................................................ 15, 26

*Proter v. Medifast, Inc.*,
2013 WL 1316034 (D. Md. Mar. 28, 2013) .......................................................... 22

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ............................................................... 25, 28

*SEC v. Pirate Investor LLC*,
580 F.3d 233 (4th Cir. 2009)................................................................... 20

*SEC v. Resnick*,
604 F. Supp. 2d 773 (D. Md. 2009)............................................................. 24

*Singer v. Reali*,
883 F.3d 425 (4th Cir. 2018) ......................................................... 11, 15, 24

*Teachers' Ret. Sys. of La. v. Hunter*
477 F.3d 162 (4th Cir. 2007) ........................................................... 7, 22, 28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)......................................................................... 19, 26

*Va. Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991)......................................................................... 9, 12

*Yates v. Municipal Mortgage & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014)................................................................... 21

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
780 F.3d 597, 610 (4th Cir. 2015)............................................................. 24

## STATUTES

15 U.S.C. § 78j(b) ............................................................................ 28

15 U.S.C. § 78u-4(b)(1) ........................................................................ 7

15 U.S.C. § 78u-4(b)(4) ....................................................................... 28

15 U.S.C. § 78u-5(c)(1)(A)(i) .................................................................. 11

## I.    PRELIMINARY STATEMENT

This is not a case where investors are relying on hindsight to complain about a "less-successful-than-hoped" business strategy. Instead, this case concerns management intentionally hiding from investors the disastrous impact of their business decisions that ultimately resulted in the complete financial collapse and bankruptcy of 2U, Inc. While 2U was experiencing a death spiral featuring a disastrous acquisition, a floundering "transition" to a new business strategy, and an ultimately fatal flight of customers, including its longstanding flagship customer, Defendants were representing that the acquisition and transition were "off to a great start" and "thriving" and the loss of customers was simply business as usual and actually a positive development for the 2U. This is not "fraud-by-hindsight"; this is an intentional misrepresentation about the current state of a company's operations that misleads investors and causes millions of dollars of losses.

Defendants urge dismissal of the Amended Complaint on three grounds: failure to plead false or misleading statements with scienter, failure to plead facts creating a strong inference of scienter, and failure to plead loss causation. None of these grounds supports dismissal. Plaintiff alleges with particularity the statements that he alleges are false, who made the statements, and why the statements are false. Nothing further is required at the pleading stage where Plaintiff's factual allegations must be accepted as true and he is entitled to reasonable inferences in his favor. The alleged misrepresentations about the success of the edX transition are directly contradicted by statements from former 2U employees with direct knowledge of the edX program describing its problems and disastrous impact on 2U's relationships with partner Institutions. Meanwhile, the statements by Defendants regarding 2U's "portfolio management" are also contradicted by the statements of the former employees as well as the statements by Defendants themselves who

1

admitted they had been negotiating the exit from major programs at the same time as they were publicly representing that relationships were stable with only minor changes anticipated.

Plaintiff's allegations for scienter are also sufficient to survive a motion to dismiss. The edX transition and relationships with Partner Institutions were the major business issue facing 2U. Defendants Paucek and Lalljie spoke publicly on these topics throughout the Class Period and, indeed, it is not credible that as senior executives they were not monitoring and managing these critical issues. Their statements misrepresenting the true state of affairs of edX and the relationships with Partner Institutions were made knowingly or at least with deliberate recklessness. This is bolstered by the fact that they received millions of dollars in compensation and through the sale of 2U stock while it was hurtling towards bankruptcy.

Finally, Plaintiff adequately alleges loss causation. The Complaint details how 2U's stock price plummeted when the truth about the termination of contracts with Partner Institutions and the failure of edX was revealed. This is sufficiently related to the alleged misrepresentations about the identical topics to establish loss causation at the pleading stage.

On a July 28, 2022 earnings call, Defendant Paucek expressed confidence in their strategy and stated that as a result "all the boats will rise." A more appropriate metaphor is "the captain goes down with the ship" but in this case, the captain does not disclose to passengers that there is a large hole in the ship's hull, instead insisting that everything is as it should be - until it is too late to abandon ship. Defendants' motion should be denied.

2

II.    **STATEMENT OF FACTS**

### A.  2U's Business Model and USC Relationship

2U, Inc. is an education technology company founded in 2008, offering online educational programs in partnership with colleges and universities through revenue-sharing contracts, typically retaining around 60-65% of student tuition. Compl. ¶¶ 38-44. Its first and most significant partner was the University of Southern California ("USC"), beginning in 2009 with teaching and social work degrees. *Id.* ¶¶ 48-50. The USC partnership was critical for 2U, providing significant revenue through high-priced online degrees, including a Master of Social Work program costing approximately $115,000 in 2021. *Id.* ¶¶ 51-52. 2U maintained long-term agreements with USC and other prestigious institutions, bolstering investor confidence due to their profitability, duration, and steep penalties for early termination. *Id.* ¶¶ 52-54. 2U's model enjoyed great success during the COVID-19 pandemic; enrollments in 2U Degree Programs increased 21% from December 2019 to December 2021, peaking at 237,245. *Id.* ¶ 55.

### B.  The edX Acquisition and "Transition"

In November 2021, 2U acquired edX, a non-profit online learning platform, for $800 million. *Id.* ¶¶ 56-57. The stated purpose was to transition 2U into a platform company with greater reach and improved marketing efficiency beyond its Partner Institutions. *Id.* Despite this transition, "the 5-10-year duration partner school degree program agreements are critical to 2U." *Id.* ¶¶ 65 (quoting Credit Suisse report). As Baird Equity Research stated in a July 28, 2022 Research Note: "2U's position in the market including its impressive list of prestigious NFPCUs and their positive view of 2U as a partner are a tremendous advantage" and "we believe that 2U's revenue share percentage will be largely sustainable." *Id.* ¶ 54.

3

### C.  Early Signs of Relationship Deterioration

The edX acquisition, however, coincided with the beginning of a deterioration in 2U's relationships with its Partner Institutions. The deterioration was fueled by a combination of poor performance by 2U as well as negative publicity. In November 2021, concerns arose publicly about USC's online programs operated by 2U, with a report published by *The Wall Street Journal* exposing significant financial struggles among graduates, resulting from high tuition and oversaturated job markets. *Id*. ¶¶ 66-67.

Throughout 2022 and 2023, complaints emerged from other Partner Institutions, such as Arcadia University, whose 2U-operated physician's assistant program failed to achieve accreditation, prompting faculty complaints of inadequate responsiveness by 2U. Id. Partner Institutions expressed general dissatisfaction over declining enrollments, reduced marketing support, and perceived inadequacies in service. *Id*. ¶¶ 85-90. Furthermore, many Partner Institutions realized that they could provide their own online education programs without 2U and retain a higher percentage of the revenue themselves. *Id*. ¶ 87.

### D.  Internal Awareness of Institutional Dissatisfaction

By early 2023, USC had begun shifting responsibilities away from 2U, signaling a deterioration of this critical relationship. *Id*. ¶ 85. Additionally, USC-specific staffing reductions occurred in April 2023, accompanied by an increased emphasis by 2U on performance metrics related to USC, indicating heightened scrutiny and dissatisfaction with 2U's service. *Id*. ¶¶ 93-94. In May 2023, graduates filed a class-action lawsuit against USC, alleging misrepresentations about program quality, aggressive recruitment tactics, and poor student outcomes. *Id*. ¶ 68. Internal reports and discussions at company-wide meetings between June and December 2023 confirm that

4

Defendants were aware of significant Partner Institutions' dissatisfaction with enrollment declines, reduced marketing budgets, and poor performance by 2U-managed programs. *Id*. ¶¶ 87-89, 114.

### E.  edX Transition Stumbles

While 2U's relationships with its Partner Institutions were failing, its transition to a platform company based on edX was also in trouble. 2U failed to invest the necessary resources to effect the transition. *Id*. ¶ 102. As a universal platform, edX failed to differentiate between the different schools and their programs and it also failed to generate sufficient new student enrollment. *Id*. ¶¶ 103-15. While 2U told Partner Institutions that their enrollments would "boom" once its programs were put on edX, enrollments were actually declined while the costs of marketing increased. *Id*. According to FE-2, the launch of edX was "really rough" and did not improve during the remainder of 2023. *Id*. ¶ 107.

### F.  "Portfolio Management Activities" in 2022 and 2023

As a result of dissatisfaction from Partner Institutions and poor financial performance by 2U, contracts with Partner Institutions were "sunsetted" or mutually terminated, usually resulting in a series of payments to 2U over the short term. *Id*. ¶¶ 123-26. This process started in 2022 with institutions such as Tufts and then massively increased during 2023. *Id*. Defendants euphemistically referred to this damage control as "portfolio management". *Id*. ¶ 125. Shockingly, on November 9, 2023, 2U and USC announced that they would wind down their 15-year partnership that had been 2U's flagship. *Id*. ¶ 118. 2U received $40 million from USC and Defendant Paucek tried to spin the termination as "very positive transactions for the business". *Id*. ¶ 247. The market was not impressed as 2U's stock price immediately declined 56.72%. *Id*. ¶ 248. A week later, Defendant Paucek was fired as 2U's CEO. *Id*. ¶ 122.

2U's business never recovered and on February 14, 2024, 2U announced the termination of more contracts with Partner Institutions and that there was a "substantial doubt about its ability to continue as a going concern." *Id*. ¶ 127. Indeed, the scale of contracts being terminated in the second half of 2023 was over ten times what 2U had experienced previously. *Id*. ¶ 125. On July 25, 2024, 2U filed for Chapter 11 bankruptcy. *Id*. ¶¶ 138-39.

### G.  Misleading Representations to Investors

Despite their awareness of both the disastrous edX acquisition and transition and the deteriorating Partner Institution relationships, Defendants did not disclose these facts to investors. Instead, on multiple earnings calls throughout 2022 and 2023, Defendants Paucek and Lalljie represented that the edX acquisition was "off to a great start", that management was "increasingly confident in our platform strategy" and edX was demonstrating "early returns" and "material progress". *Id*. ¶¶ 154, 170, 179, 189, 199. On August 8, 2023, as it was beginning its death spiral, 2U issued a press release stating that its "platform strategy is thriving". 2 months later, 2U announced the termination of its USC relationship and never recovered.

Defendants Paucek and Lalljie also characterized contract "sunsetting" and "portfolio management activities"—terms used for terminating or scaling back institutional partnerships—as routine and beneficial. *Id*. ¶¶ 97-99, 122. On April 26, 203, they specifically denied any need or intention to renegotiate or terminate key contracts, creating a misleading impression of stability. *Id*. ¶ 98. Notably, the scale of these activities dramatically increased in 2023, with undisclosed terminations, including with prominent universities such as Tufts, American, and Baylor. *Id*. ¶¶ 123-125. Investors learned only afterward about the ten-fold increase in termination-related revenue from "portfolio management activities," as Defendants concealed the true scope and significance of partnership deterioration. *Id*. As late as August 8, 2023, Defendant Paucek told

6

investors that "we do feel very confident in the current client relationships" and "feeling really very positive about the existing client base." *Id*. ¶ 230. This was at the same time 2U was looking to terminate major contracts, including with their flagship institution, USC.

### III. ARGUMENT

#### A. THE COMPLAINT PLEADS MATERIAL MISREPRESENTATIONS AND OMISSIONS

The PSLRA requires plaintiffs to "'specify each statement alleged to have been misleading'" and "'the reason or reasons why the statement is misleading.'" *Burt v. Maasberg*, 2014 WL 1291834, at *13 (D. Md. Mar. 28, 2014) (quoting 15 U.S.C. § 78u-4(b)(1)). At the pleading stage, Plaintiff is entitled to all reasonable inferences drawn from the allegations in the complaint. *Davis v. Trans Union LLC*, No. 1:24-CV-02338-JRR, 2025 WL 886173 at *5 (D. Md. Mar. 21, 2025), . "[A] plaintiff is not required to plead evidence or prove its case at the motion to dismiss stage. Alleging that a statement was made is enough, and the court must accept the allegation as true." *Fam. of Care Real Est. Holding Co. v. Chapman Prop., LLC*, No. CV DKC 23-0574, 2023 WL 4134427, at *4 (D. Md. June 22, 2023)

When a complaint alleges "'sufficient facts to support a reasonable belief in the allegation that the defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this "misrepresentation" element.'" *Epstein v, World Acceptance Corp.*, 2015 WL 2365701, at *5 (D.S.C. May 18, 2015) (quoting *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007)) (emphases in original). "As a general rule, the trier of fact decides whether a public statement is misleading." *Kiken v. Lumber Liquidators Holdings, Inc.,* 155 F. Supp. 3d 593, 601 (E.D. Va. 2015).

Throughout the Class Period, Defendants made numerous false and misleading statements. The statements fall under the following two categories: (1) statements regarding the edX

7

acquisition and transition to the platform strategy; and (2) statements regarding 2U's relationships with its Partner Institutions and "portfolio management".

### 1. Statements of past or current facts about the edX acquisition and transition to the platform strategy.

Defendants made repeated statements about the success of the edX acquisition and the transition to the platform strategy. From the beginning of the Class Period on February 9, 2022, Defendants lauded its success describing it as "transformational" and establishing "a strategic and financial framework for achieving our mid-term goals and creating shareholder value." Compl. ¶ 142; *see also id*. ¶ 145. On May 5, 2022, Defendant Paucek described the edX transition as "off to a great start", *id*. at ¶ 154, and on July 28, 2022, he stated that "we've become increasingly confident in our platform strategy, which puts edX at the center" and that "as we aggregate the activity under edX, all the boats will rise." *Id*. at ¶¶ 170-73. Three months later, on November 7, 2022, Defendant Paucek told investors that "we're seeing material progress" regarding the transition to edX, *Id*. at ¶ 189, and on January 9, 2023, Defendant Lalljie told investors that "we continue to see returns from our platform strategy". *Id*. at ¶ 199. Finally, on August 8, 2023, 2U announced that its "platform strategy is thriving." *Id*. at ¶ 220.

As described by 2U former employees who were grappling with edX during 2022 and 2023, none of these statements is true. The edX platform and interface did not meet the needs of 2U's existing Partner Institutions. *Id*. at ¶ 104. Course materials were difficult to find and the edX platform failed to attract prospective students in the number and of the quality that the Partner Institutions expected and 2U promised. *Id*. at ¶¶ 104-05, 110. The launch of edX was "really rough at the start" and did not improve during 2022 or 2023. *Id*. at ¶ 107. 2U also failed to support edX with the necessary digital marketing. *Id*. at ¶¶ 111-14.

8

Thus, it could never be said that edX was "off to a great start" or that it was "thriving". In response, Defendants argue that the statements were either non-actionable statements of corporate optimism or forward-looking statements. Motion at 10-20. Defendants are wrong on both counts. The statements that edX is "thriving" and "off to a great start" is a concrete statement of the execution of a business strategy. The determination of whether statements are "puffery" requires considering those statements in context. *Howard v. Haddad*, 962 F.2d 328, 331 (4th Cir. 1992) *See also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672-73 (6th Cir. 2005) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.")

The use of some "soft" or "puffing" language does not render an otherwise false or misleading statement immaterial. *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (statements of "opinion or puffery" may be actionable "in particular contexts when it is both factual and material"); *In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002) ("A statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available"), *aff'd,* 374 F.3d 1015 (11th Cir. 2004). The statements are not nonactionable optimism but rather are "specific factual allegations … [that] can be proven true or false." *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*, 2017 WL 11562247, at *4 (D. Md. July 6, 2017) (representation that renewed contract would be a "big, beautiful package" was actionable because, "taken together and in context," it "created a false belief in the minds of the market" that the contract "would allow at least the status quo to continue"); *Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004); *See, e.g., Va. Bankshares, Inc. v.*

*Sandberg*, 501 U.S. 1083, 1093-94 (1991) (statements that price was "high" and proposal "fair" to shareholders were actionable); *Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *4 (W.D.N.C. Feb. 8, 2018) (representation of "strong backlog" actionable where the complaint alleged that defendants were aware of undisclosed problems and delays); *see similarly KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *5 (D.S.C. July 25, 2016); *Kiken,* 155 F. Supp. 3d at 603-04 ("product quality" and "high quality standards" statements were actionable).

In *Emergent Biosolutions*, the Court held that where a company "repeatedly told the market" it was confident that the company's multi-year contract with the Centers for Disease Control to produce an Anthrax vaccine would be renewed, and the company later disclosed that the renewed contract called for substantially less doses than the expiring contract and provided for public bidding on a next generation vaccine, defendants' statements were actionable. 2017 WL 11562247, at *4. Specifically, the *Emergent Biosolutions* court held that a statement made by the CEO that the renewed contract would be a "big beautiful package" was a material misstatement because of the context in which it was made: on a conference call with financial analysts, using the present-tense, made by the CEO, a sophisticated businessman, and importantly, when considering the "powerful inference" that the company only had one product, and a contract running down, it was negotiating for its survival, and taking the statements in context created a false belief in the market that the renewed contract would be essentially the same as the expiring contract. *Id*. Here, there are similar facts: statements made to analysts and the investing public, by an experienced and sophisticated CEO and CFO, using the present-tense – as explained below – to describe the state of the company's most important asset, at a critical juncture for the company. Accordingly, Defendants' statements regarding the edX program are not corporate puffery but actionable misrepresentations of existing facts.

10

The argument that these statements are forward-looking is also misguided. The statements describe the current status of the edX platform strategy; they are not forecasts of how the edX transition will play out in the future. This is apparent from the language of the statements themselves: "we've **become** increasingly confident in our platform strategy"; "we're **seeing** material progress" regarding the transition to edX; "we **continue to see** returns from our platform strategy"; and the "platform strategy **is** thriving." None of these statements use the future tense and are not properly characterized as forward-looking.

In addition, Defendants contend that their forward-looking statements are protected by the PSLRA's "safe harbor" provision. ECF No. 42-1, ("Mot.") at 14-15.) Not so. The safe harbor applies only if the "forward-looking statement … is accompanied by *meaningful* cautionary statements ...."  15 U.S.C. § 78u-5(c)(1)(A)(i). (emphasis added). As a threshold matter, "the adequacy of cautionary language is a question of fact, and, typically, is not a question to be resolved on a motion to dismiss." *Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353, at *5 n.10 (D. Md. Sept. 10, 2007); *see Ollila*, 2018 WL 792069, at *5; *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 790 (E.D. Va. 2015). If, however, the Court does consider the issue at this stage, Defendants' cautionary language was not "meaningful." First, Defendants' cautionary language was consistently boilerplate, without substantive updates, throughout the Class Period. Drawing from the entire Class Period, Defendants identify hollow statements such as "[i]f students do not expand beyond the free offerings available on our platform, our ability to grow our business and improve our results of operations may be adversely affected." Moreover, the cautionary language identified by Defendants warned of risks that had *already materialized* and, thus, such statements are not immunized. *Singer v. Reali*, 883 F.3d 425, 442-43 (4th Cir. 2018) (finding that risk warnings were too general to immunize misleading statements where

11

defendants warned, as here, that the company "*may* be subject to or otherwise affected by federal and state healthcare laws, including fraud and abuse and health information privacy and security laws, and *could* face substantial penalties *if* we are unable to fully comply with such laws") (emphases added).[1]

Defendants also argue that "numerous" (although they only list five statements) of the statements are "non-actionable" opinion because they are prefaced with "we believe," or "we feel", or are "statements expressing 'confidence' in 2U's transition[.]" Mot. at 15-16. But the Complaint sufficiently alleges that these "opinions" could not have been sincerely held given Defendants' contemporaneous knowledge of problems undercutting those statements (as explained *supra* at 5-6 and *infra* at 14-16; 24-27). *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 176 (2015); *see similarly Ollila*, 2018 WL 792069, at *6 (statements of opinion actionable "[a]s plaintiff alleges that they were not sincerely held"). The opinions are actionable because Defendants omitted "particular (and material) facts going to the basis for the[ir] opinion," and omitted "material facts about the [defendants'] inquiry into or knowledge concerning" the opinions. *Omnicare*, 575 U.S. at 194; *see also Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 667-68 (D.S.C. 2016). Here, Defendants' statements were "reasonably understood to rest on a factual basis that justifie[d] them as accurate, the absence of which render[ed] them misleading." *Ollila,* 2018 WL 792069 at *5 (quoting *Va. Bankshares*, 501 U.S. at 1093).[2]

---

[1] See also *Ollila,* 2018 WL 792069 at *5; *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co., 827 F. Supp. 2d 559, 576 (D.S.C. 2011). Paradise Wire & Cable Defined Benefit Pension Plan v. Weil,* 918 F.3d 312 (4th Cir. 2019), is easily distinguishable. There, the risk warnings were "extensive, specific, and tailored," and "significantly," the "case d[id] not involve" a "situation" where "factual information in disclosure documents [was] known to be false." *Id*. at 319-20.

[2] The statements of opinion in *In re Sinclair Broadcast Group, Inc. Sec. Litig.*, 2020 WL 571724,

### 2. Statements regarding 2U's relationships with its Partner Institutions and "portfolio management".

The Complaint pleads with particularity misrepresentations of current fact regarding 2U's partnerships with large institutions, specifically by representing that they were "really stable", and subject to "very small changes". This assuaged the market's concerns that 2U's transition to a platform company would cause partner attrition. So Defendants confidently insisted, in response to a question about how 2U's transition to a flex-based model might affect 2U's relationships with Partner Institutions: "We've got really stable partnerships across the board. Partners are in a good place." Compl. ¶ 191. Defendant Paucek continued to tout the quality of 2U's services to partner institutions vis-á-vis its competitors, claiming "[w]e have best-in-class learner and partner support services something that the rest of the space typically does not have. This creates high-quality online education at scale, combining the reach of edX with the enabling services of 2U." Compl. ¶ 209. On April 26, 2023, Defendant Paucek stated "We do not feel the need to rework any contracts at this point, and we are not reworking any contracts at this point." *Id*. ¶ 98. Later Paucek admitted that 2U was always negotiating some contracts and that by April 2023, 2U had already terminated some contracts in 2022 and the first six months of 2023 and was negotiating even bigger terminations later in 2023. *Id*. ¶ 99. At 2U's 2023 Investor Day, Paucek responded to questions from investors concerned with the effect of 2U's transition on contract renewals with large Partner Institutions by highlighting a recent renewal. *Id.* ¶ 210. Lalljie amplified those statements,

---

at *8-9 (D. Md. Feb. 4, 2020), were not actionable because "[a] reasonable investor would have understood that, notwithstanding Sinclair's own position, the final arbiter of FCC compliance is the FCC, not Sinclair," and "[a]ccording to [Plaintiff]'s own version of the facts[,]…negative feedback from the FCC came only after the alleged misstatements were made."

representing "in terms of the traditional full launches, we assume a fraction of very small changes." *Id.*

Finally, Paucek continued to stress the purportedly robust nature of 2U's customer base: "Existing contracts represent -- it's like greater than 90% of our revenue through -- nonetheless, it's -- we do feel very confident in the current client relationships and our ability to navigate new -- moving people to flex, in some cases. . . . So feeling really very positive about the existing client base." Compl. ¶ 230. Notably, this statement was made on August 8, 2023, a mere 93 days before USC announced it was cutting ties with 2U. *Id.*  In a response to questions from financial analysts regarding how the platform transition would affect Partner Institutions in July 2022, Defendant Lalljie insisted that despite the change in strategy, 2U's Partner Institutions would need a platform: "the story of marketing these programs more and more, we do think that the platform is a necessity. It's really not an option -- it's not optional, like you need to have this kind of platform." ECF No. 42-11, Ex. 7, at 13. In November 2022, Paucek continued to tell the investing public a story that the transition would not harm Partner Institutions: "[o]ur partners understand, for the most part, if something is large, if it's a program that is really meaningful to the partner and to 2U, they understand that you can't get there without the scale that the paid marketing brings to the table." Compl. ¶ 191. Paucek continued, rejecting any notion that the edX transition was harming 2U's relationships with Partner Institutions: "[w]e've got really stable partnerships across the board. Partners are in a good place." *Id.* Lalljie stated on August 8, 2023 that 2U's "portfolio management" showed "our platform strategy is working." *Id.* ¶ 100. Defendants also repeatedly affirmed 2U's guidance for revenue and adjusted EBITDA for 2023 despite the significant contract termination that was being undertaken at the same time. *Id.* ¶¶ 212, 220. Finally, throughout the

14

Class Period, 2U consistently stressed that its contracts had terms of 10 to 15 years with limited termination rights. *Id*. ¶¶ 148, 158, 163, 181, 202, 215, and 221.

These and other similar representations were materially false and misleading when made because 2U's relationships with Partner Institutions had in fact degraded. In fact, at the time Paucek was reassuring investors, the Partner Institutions on which 2U's revenue depended were already in the process of disengaging with 2U. As recounted by several former employees, beginning in 2021 and continuing through the Class Period, Defendants saw 2U's relationships with Partner Institutions degrade. In 2023, 2U's former employees observed that USC was in the process of taking over duties that fell under the "bundled services" 2U was contractually obligated to provide, like advising and providing program support to Degree Program students, because it seemed like USC no longer trusted 2U. *Id.* ¶¶ 91, 95.

In 2022, 2U had already started terminating some agreements with Partner Institutions and this process accelerated during 2023. *Id*. ¶¶ 123-26.  Investors were not informed.  In the August 8, 2023 conference call, Defendants Paucek and Lalljie admitted that 2U had been negotiating agreements to sunset certain programs during the second quarter of 2023. *Id*. ¶¶ 226-27. At that time, they did not disclose the scale of these negotiations or the likely impact on 2U's business. *Id*. Indeed, they represented that 2U's "business is moving strongly in the right direction" and "on track". *Id*. ¶¶ 226-27.  These agreements ultimately resulted in payments of $88 million, more than ten times the amount of payments received for the termination of agreements in the past. *Id*. ¶ 249. This included the termination of 2U's flagship program: USC.  *Id*. ¶ 239.  Just over six months later, 2U was filing for bankruptcy.  *Id*. ¶¶ 138-39.

Once Defendants chose to discuss 2U's business model, client relationships, student enrollment, and marketing efficiencies, they were subject to a duty to disclose a mix of information

15

that was not misleading. *Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018) ("by choosing to inform the market that it was training surgeons on how to obtain reimbursements for the System[,]…the Company was obliged to further disclose its fraudulent reimbursement scheme, i.e., its instructions to surgeons to unlawfully code the System under Category I. Otherwise, the Officers' statements about the Company's training efforts were utterly misleading."); *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003) (defendants' positive statements about the integration of two businesses created a duty to disclose that the combined company was experiencing a loss of referral business). Here, Defendants' statements about the stability of 2U's customer relationships during the transition in its business model explicitly stated that there was minimal disruption with existing Partner Institutions when, in fact, many Partner Institutions, including its flagship client USC, were currently seeking to exit their 2U contracts. This presented a false and misleading impression of the existing factual circumstances of 2U's business relationships with its Partner Institutions that through their partial disclosures on the topic, Defendants had a duty to disclose.

Defendants argue generally that "all of these statements were true and not misleading." (Mot. at 21.)  Leaving aside the fact that, to the contrary, many of the statements were literally *false*, "the fact that a statement is literally accurate does not preclude liability under federal securities laws" *Epstein,* 2015 WL 2365701, at \*5; *see also Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 249 n.10 (D. Mass. 2006) ("[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors."); *In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 350 (D.N.H. 2006) ("the fact that a statement is literally accurate does not preclude liability under federal securities laws").

16

Defendants argue that they were "candid that transitioning to a platform company would require ending some existing partnerships, including through early terminations of partner agreements." (Mot. at 5). Defendants cite to the consolidated statements page of 2U's quarterly report on Form 10-Q for the period ended June 30, 2023 ("Q2 2023 Form 10-Q"), dated August 8, 2023. *Id.*; ECF No. 42-22, Ex. 18 at 7-8. The only statements in the Form 10-Q cited by the Motion are 2U's cash flow statements. (page 680-681 of Exhibits to MTD). On February 14, 2024, 2U disclosed that as of December 31, 2023 and December 31, 2022, the Company had balances of $68.2 million and $6.4 million of unbilled revenue associated with portfolio management activities. In **other words, termination payments with Partner Institutions increased 10-fold between 2022 and 2023**. ¶ 15. On August 8, 2023, Defendant Paucek said: "we're continually pretty much never not in some kind of discussion or negotiation with our clients. We do have a very, very substantial percentage of the revenue locked… [e]xisting contracts represent -- it's like greater than 90% of our revenue." *Id.* ¶ 99. Defendant Paucek added: "we've been doing this for some time now." *Id*.

As an example of 2U's candor, the Motion points to 2U's FY 2021 earnings call, where Defendant Paucek disclosed only that 2U had decided to wind down the partnership with Simmons due to profitability concerns. Mot. at 5-6; ECF No. 42-5, Ex. 1 at 5. When faced with questions from financial analysts as to the cause and effect the Simmons wind-down, Defendant Lalljie addressed the specific financial effect of the termination, and Defendant Paucek stated:

> With regard to the other degree programs, we definitely had some move out of the cadence of 2022. I mentioned one specific accreditation delay. We had several others that -- higher ed right now is definitely seeing unprecedented leadership change, just like the rest of the world, from a Great Resignation standpoint. So you're talking about a bunch of leaders changing inside of higher ed. That had an impact on some programs.

*Id*. at 10.

17

Defendants also contend that in August 2023, Defendant's Paucek's statement that "[p]art of transitioning to a platform company involves rotating our offerings," "expanding from highly selective and expensive programs to those with greater access and affordability[]" was sufficient disclosure to investors that contracts with Degree Program Partner Institutions, "critical" to 2U's business, were ending. Mot. at 6; ECF No. 42-20, Ex. 16 at 5. A reasonable investor would not, in considering the total mix of information, take Defendants' statements to suggest that the state of 2U's relationships with its Partner Institutions was so bad that three months later 2U's most important partner would exit and six months later 2U would be considering bankruptcy.

Defendants cherry-pick a few examples to maintain that Defendants "explicitly informed" the public about the allegedly omitted information but even those statements are misleading when they are properly considered in the context of Defendants' transition story. (Mot. at 17-18.) For example, Defendants represented it informed investors it would "aggressively manage [its] portfolio" and exit programs that "do not fit," Ex. 16 at 5. This statement would have misled a reasonable investor by painting a picture of 2U in control of its relationships with Partner Institutions. That image, however, was unsupported by the facts on the ground at 2U, including the fact that it was already encountering material problems with its Partner Institutions, who were unhappy with 2U's transition. Those facts were concealed from investors. Likewise, Defendants' representations of flattering data on their "Early Returns" slide was false because the new marketing framework was not more efficient. Mot., at 19; ¶¶ 184, 188 Far from implementing a "new, more efficient marketing framework" 2U was losing its relationships with Partner Institutions. ¶¶ 184; 189. To make accurate disclosures, Defendants should have revealed the obstacles to Partner Institution retention that 2U was facing at the time, such as the fact that 2U's talismanic Partner Institution USC had begun the process of pulling away from 2U in 2023. When

read in context and in the light most favorable to Plaintiffs, Defendants' representations imply that 2U's relationships with Partner Institutions were "really stable" and "in a good place" during its transition, and that 2U's transition was "a powerful driver of profitable growth and margin improvement." ¶ 144. Such an implication could not have been further from reality.

### B.  THE COMPLAINT ADEQUATELY PLEADS SCIENTER

"The Fourth Circuit has held that a plaintiff may allege the required state of mind, or scienter, for securities fraud liability by pleading intentional misconduct or recklessness." *Carlucci v. Han*, 907 F. Supp. 2d 709, 728 (E.D. Va. 2012). "Scienter exists if the defendant knew the statement was misleading or knew of the existence of facts which, if disclosed, would have shown it to be misleading.'" *Id.*  A showing of scienter does not require evidence of motive. *Lefkoe*, 2008 WL 7275126, at \*8.  Moreover, scienter allegations "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). Rather, the Complaint need only create an inference of scienter that is as compelling as any nonculpable explanation, with any "'tie [going to] the plaintiff.'" *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (citing *Tellabs*, 551 U.S. at 323). Here, the Complaint's allegations establish a strong inference of scienter.

### 1.  The Individual Defendants Had Access to and Closely Monitored Developments with 2U's Partner Institutions

Multiple former employees explained that Defendants Paucek and Lalljie had access to and closely monitored 2U's enrollment and marketing data as well as feedback from Partner Institutions. Specifically, FE-1 through 4 prepared reports on respective enrollment and marketing activities, which were shared with higher-ups and ultimately with Defendant Paucek on a consolidated level. Declining bootcamp enrollment numbers alerted the Individual Defendants to

19

the fact of their destabilizing relationships with Partner Institutions no later Paucek's awareness of issues raised by Partner Institutions is also supported by the fact that 2U formed two leadership counsels when it acquired edX—the University Leadership Council and the University Partner Advisory Council ("UPAC"). *Id*. ¶ 262. These councils, the UPAC in particular, were formed to ensure that 2U could regularly and routinely confer with key leaders from across the combined 2U and edX partner network. *Id*. 2U's President of Partnerships Andrew Hermalyn was the company's representative to the boards and reported to Paucek, keeping him up to date with the state of 2U's relationships with its Partner Institutions, including complaints about cost, program quality, and marketing efforts, as later described in the Chronicle of Higher Education. *Id*. These allegations demonstrate that the Individual Defendants were closely involved in the monitoring and managing of 2U's relationships with Partner Institutions and paid attention to issues impacting growth, like overall student enrollment rates, marketing efficiencies, and partner complaints contributing to a strong inference of scienter. *See SEC v. Pirate Investor LLC*, 580 F.3d 233, 243 (4th Cir. 2009) (defendants "knew facts or had access to information suggesting that their public statements were materially inaccurate," thus presenting "[o]ne of the classic fact patterns giving rise to a strong inference of scienter"); *Latham v. Matthews*, 662 F. Supp. 2d 441, 467 (D.S.C. 2009) (strong inference of scienter where defendants were personally or intimately involved in the sales, marketing and production activities that the plaintiffs alleged were false and misleading); *Epstein,* 203 F. Supp. 3d at 671 (factors indicating scienter include "Defendants' close monitoring of the Company's day-to-day business and corporate practices"); *Carlucci,* 907 F. Supp. 2d at 729 (defendants "knew facts or had access to information suggesting [their] public statements were not accurate," thus supporting a strong inference of scienter); *Ollila*, 2018 WL 792069, at *3 (scienter sufficiently pled by allegations that defendants "had

20

access to information" about undisclosed problems at the company); *Lefkoe*, 2008 WL 7275126, at \*8 ("securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements").

Former employees also describe the Individual Defendants as hands-on executives. FE-5, who was a Success Advisor assigned to USC, observed that Paucek was attentive to the effect of *The Wall Street Journal* report, and held a town-hall meeting to address employees' concerns, as well as engaged with employees like FE-5 on several calls. Compl. ¶ 96. "Defendants' intimate involvement in the day-to-day operations of the Company … bolsters Plaintiff's claims of scienter and boosts the inference of 'actual' exposure to the problems [the company] was experiencing." *KBC*, 2016 WL 3981236, at \*9; *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) ("executives' detail-oriented management style" supported scienter); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) (same).

Defendants argue that the former employees' allegations are not grounded in their personal knowledge (Mot. at 27), and that some of the employees did not report directly to the executive defendants. But direct reporting is not required, and Plaintiffs allege each former employee's job description and responsibilities within 2U, demonstrating the employees' personal knowledge of the facts they recounted. *See Lefkoe*, 2008 WL 7275126, at \*7 (crediting confidential witnesses' allegations where the complaint provided "job descriptions that suggest that the sources would have personal knowledge of the facts alleged and, in many cases, provides multiple sources to corroborate facts").

21

The cases on which Defendants rely are inapposite. *Yates v. Municipal Mortgage & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014), involved efforts by defendants to comply with a "difficult, "complex," and "challenging new accounting standard." *Id.* at 887. Moreover, the Court did not hold that a confidential witness must have reported directly to or have direct contact with an individual defendant, because statements by confidential witnesses are reliable as long as they were in a position to "possess the information alleged …." *Id.* at 885.[3] *In re Coventry Healthcare, Inc. Securities Litigation*, 2011 WL 1230998, at *7 (D. Md. Mar. 30, 2011), involved no allegations that the individual defendants were told by the confidential witnesses about the issues or "*otherwise knew about these issues*." (Emphasis added.) In *Hunter*, 477 F.3d at 181-82, a confidential witness' assessment in valuing the business was contradicted by other facts alleged in the complaint, and other facts alleged by the plaintiffs were in line with the company's actual disclosures. *Proter v. Medifast, Inc.*, 2013 WL 1316034, at *11-12 (D. Md. Mar. 28, 2013) simply stands for the unremarkable proposition that someone's position of control in the company or general, vague allegations of access to information, *without more*, are insufficient to satisfy scienter. Far from pleading fraud, the allegations in *Proter* involved "generic pleading[s]" that the fraudulent scheme "could not have been perpetrated without the knowledge and complicity of the personnel at the highest level of the Company, including each of the Individual Defendants."

### 2. Defendants' Own Statements Support a Strong Inference of Scienter

During the Class Period, the Individual Defendants repeatedly assured the market of the strength of 2U's relationships with its Partner Institutions, including that "[w]e've got really stable

---

[3] Courts routinely credit allegations of confidential witnesses who are not alleged to have had direct contact with the individual defendants. *See*, *e.g.*, *In re Sinclair*, 2020 WL 571724, at *16- 17; *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *16 (E.D. Pa. June 16, 2015).

22

partnerships across the board. Partners are in a good place." Compl. ¶ 95 On analyst calls throughout the Class Period, Defendants Paucek and Lalljie confidently and repeatedly assured investors that 2U was fully in control of the process of partner contract renegotiation. *Id*. ¶ 191. For example, Paucek told investors in August 8, 2023 that:

> Of note for the quarter, we expected to sunset some programs in Q2, which would have resulted in significant additional revenue in the quarter. These were pushed into the back half of the year . . . [w]e've had some of these in the first 6 months of [2023]. We will continue to have them. So unfortunately, we had multiple universities in play on this, and it's a shift. But we feel very confident in our ability to manage them overall, and we like the mix that we're moving to.

*Id*. ¶ 256. Defendant Lalljie added: "As part of our portfolio management efforts, in the second quarter, we expected to finalize agreements to sunset certain programs. However, these were pushed into the second half of the year. These agreements would have generated revenue in the Degree Program Segment in the second quarter." *Id.*

Defendants Paucek's and Lalljie's statements explicitly claim knowledge of the state of 2U's relationships with its Partner Institutions and thus, as confirmed by the FEs, that these relationships were crumbling during the Class Period and were expected to sunset in the second quarter of 2023. *Id*. ¶ 256. They knew and disclosed that this would result in significant additional revenue in that quarter. *Id*. Their statements reference USC and an undisclosed partner's termination fees that were disclosed in November 2023. *Id*. Accordingly, in August 2023, Defendants Paucek and Lalljie knew 2U was losing an important customer. Because the termination was initially expected to occur in the second quarter of 2023, negotiations for ending such material contracts were ongoing through 2023 and possibly began in 2022.

Taken together, these statements, statements made on other conference calls and in 2U's SEC filings, as detailed in *supra*, at 7-16. raise a strong inference that Defendants Paucek and

Lalljie knew or were reckless in not knowing about the false and misleading nature of their statements when they made them. Defendants Paucek's and Lalljie's statements raise a strong inference that 2U knew its relationships with Partner Institutions were degrading and that by August 2023, 2U was losing its most important client. By repeatedly insisting—notably in response to analysts' questions addressing the very issue—that 2U's relationships with its partners were stable, their contractual terms lasted for over a decade, and any sunsetting or portfolio management activities were done in the normal course of business over the years, Defendants Paucek and Lalljie either:(1) knew that 2U was unable to sustain relationships with key universities and organizations and as a result certain degree programs would be cancelled; or (2) were reckless in not knowing or investigating that this was the case. Under either scenario, there is a strong inference that the Defendants made these statements with scienter. *Singer*, 883 F.3d at 444 ("in any event, the fact that the System's new Category III code did not result in substantially greater losses to TranS1 would have put any otherwise-innocent Officer on notice that the fraudulent reimbursement scheme was afoot"); *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 610 (4th Cir. 2015) (strong inference of scienter where "the plaintiffs' allegations, when considered in the context of the entire complaint, [demonstrated] that the defendants either knowingly or recklessly misled investors by failing to disclose critical information … while releasing less damaging information that they knew was incomplete"); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) (stating that it is "exceedingly unlikely" that top executives did not know facts about a corporation's "most important products," particularly where they communicated with the market about those products); *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) (defendant may be culpable "as long as what he knew made obvious the risk that his confident,

24

unhedged [assertions] would mislead investors"); *KBC,* 2016 WL 3981236, at *9 (allegations that Defendants "repeatedly spoke on these issues at conferences, on conference calls, and in press releases" support scienter); *Genworth*, 103 F. Supp. 3d at 785 ("The fact that Defendants made repeated misrepresentations over the course of a year 'also suggests a substantial degree of scienter.'") (quoting *SEC v. Resnick*, 604 F. Supp. 2d 773, 782 (D. Md. 2009)).

### 3. Partner Relationships Were Critical To 2U's Core Operations

Defendants' knowledge of the declining state of relationships with 2U institutional partners, and thus the overall health of the degree segment that depended on those relationships, can also be inferred because those facts were critical to 2U's operations and its operational success. 2U's Degree Program operates on a revenue-sharing model, wherein the universities with which 2U partners pay 2U a significant percentage—up to 60%—of the tuition and fees that students who enroll in the partnership programs pay to obtain their degrees. The Degree Program was 2U's "critical to 2U." Compl. ¶ 65. Thus 2U's continued ability to enroll students was critical to its financial success and further contributes to a strong inference of scienter. *See Genworth,* 103 F. Supp. 3d at 784-85 (misrepresentations concerning one of the company's "core sets of businesses" are "certainly relevant to the Court's holistic analysis" of scienter, and the fact that the Individual Defendants held senior executive positions "augments the other allegations of intimate involvement pleaded elsewhere in the Amended Complaint"); *KBC*, 2016 WL 3981236, at *9 ("In addition to the inferences drawn from Individual Defendants' positions, the allegedly misrepresented issues all related to core operations, which by nature can contribute to a strong inference of scienter"); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (similar); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (core operations doctrine supported scienter where only 18% of the company's revenues were at issue).

### 4. The edX Platform Was Critical to 2U's Core Operations

Defendants' knowledge that a transition to a platform company would lead to a decrease in full course equivalent enrollments can be inferred because the acquisition of edX was critical to 2U's core operations. 2U's ability to effectively utilize edX was critical to 2U's financial success. Defendants discussed the realignment plans throughout the Class Period and how the acquisition would enable 2U to transition from primarily a graduate degree-based Online Platform Manager (OPM) company to a comprehensive online education platform company. Thus, there is a strong inference that Defendants knew or were deliberately reckless in not knowing or disregarding, that their statements regarding edX, *supra*, at 8-9, were materially false or misleading when made. There also a strong inference that Defendants knew or were deliberately reckless in not knowing that the transition to a platform company would lead to a decrease in full course equivalent enrollments.

5.   **Defendants' Motive Arguments Do Not Add Anything to Scienter Analysis**

Defendants contend that the absence of an alleged motive for fraud is damaging to the scienter allegations in the claim. (Mot. at 24). Defendants overstate the strength of precedent on this point, and even if motive were as important to the determination of scienter as Defendants claim, there is an obvious motive to avoid disclosing information that would reveal to the entire investing public the failures of Defendants' business. For his part, Defendant Paucek, was involved in 2U from conception to the revelation that it had lost its most important asset – its relationship with its Partner Institutions. Even if Defendant Paucek's vanity did not provide a sufficient motive to misrepresent the state of 2U's relationships with its Partner Institutions, pragmatism may. Defendant Paucek was likely motivated by his desire to stave off 2U's sinking for as long as possible. He likely believed that if it could survive a bit longer, it could make the changes it needed to stay afloat. For this to work, investors would need to believe 2U's investment thesis – that its pivot to a platform was focused purely on growth – not on a challenging business environment or degrading relationships with Partner Institutions.

26

While Defendants cite *LifeWise Family Fin. Sec. v. Holden (In re Triangle Capital Corp. Sec. Litig.)*, 988 F.3d 743, 752 (4th Cir. 2021) for the proposition that an absent motive for fraud "weighs heavily" against the Plaintiff in a scienter analysis. In full, the decision reads: "[w]hile the absence of a motive allegation **'is not fatal,'** we do not ignore its absence, for it **often** "weigh[s] heavily" in a scienter analysis. *Id.* at 325 (citing *Tellabs*); *see also Ottmann*, 353 F.3d at 345 (noting that the lack of facts showing "a motive and opportunity to commit fraud *may be* relevant to the scienter inquiry"). Specifically, *In re Triangle* focuses the effect of alleged omissions when combined with a lack of alleged motive. 988 F.3d at 745. Here, the Complaint pleads facts sufficient to raise a strong inference that Defendants had actual knowledge that its Partner Institutions were seeking to exit their contract with 2U or knew or recklessly disregarded the falsity of their statements that despite the transition to a platform, the relationships with Partner Institutions were not negatively affected. *See In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 761 (E.D. Va. 2004) ("[C]ourts should not restrict their scienter inquiry by focusing on specific categories of facts, such as those relating to motive and opportunity, but instead should examine all of the allegations in each case to determine whether they collectively establish a strong inference of scienter.").

6. **Defendants' Alternate Inference Is Not More Compelling Than the Complaint's Strong Inference of Scienter.**

The inference of scienter arising from the Complaint's cumulative allegations is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). Defendants understood that the market linked 2U's continued success to its unique and long-running relationships with Partner Institutions. Defendants hid the truth from investors because they knew it would disappoint analysts and investors. *See Massey Energy*, 883 F. Supp. 2d at 621 ("these allegations are

27

sufficient to support Plaintiffs' inference that Defendants elected not to disclose more measurable safety metrics because they believed it would have an impact on the market"); *Epstein*, 2015 WL 2365701, at *7 (plaintiff pled "recklessness by claiming that Defendants had information about the true nature of its business conditions and performance but withheld making certain disclosures in order to control the timing and flow of the information").

The opposing inference proffered by Defendants that the "Defendants were keeping investors informed as best they could in challenging and evolving circumstances[,]" (Mot. at 3) and "Defendants kept investors informed about the long-term nature of the strategy, its risks, and the possibility not all Partners would support it" (Mot. at 26) should be rejected as implausible and directly contradicted by the Complaint's allegations, including the accounts of 2U's former employees. *Epstein*, 203 F. Supp. 3d at 670 ("Any attempt by the moving party to assert its own version of events should be disregarded, as facts alleged in a plaintiff's complaint are all accepted as true at this stage in the case."). If Defendants' illogical spin on the facts were true, then Defendants were extremely reckless when providing assertions of confidence in 2U's relationships with Partners Institutions when they had insufficient knowledge to support such statements or were recklessly ignoring facts available to them at the time. *See Killinger*, 687 F. Supp. 2d at 1260 (when a defendant speaks and does not have actual knowledge about the subject at hand, "it would be at least actionably reckless to reassure the public about these matters at all"). If Defendants truly did not know that their relationship with USC was breaking down, it was reckless to make as many statements expressing confidence and reassuring investors that the relationships were fine.

Even a tie in the scienter analysis goes to the Plaintiff. But the facts here heavily tilt the scale in Plaintiffs' favor.

### C.  THE COMPLAINT PLEADS LOSS CAUSATION

To state a claim for securities fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), the PSLRA requires a complainant to plead "loss causation," *i.e.*, that the defendant's misrepresentation or omission "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). The 4th Circuit requires that loss causation be alleged in the complaint with enough specificity to evaluate whether a causal link exists between the harm and the alleged misrepresentations. *Hunter*, 477 F.3d at 186. Because loss causation is fact-dependent, the sufficient specificity to plead loss causation varies depending on the facts and circumstances of each case. *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 465 (4th Cir. 2011). To allege the "necessary causal link" between conduct and the alleged harm, "the facts alleged in the complaint need not conclusively show that the securities' decline in value is attributable solely to the alleged fraud rather than to other intervening factors … [w]hat courts do require the alleged facts to show is that the misrepresentation or omission was one substantial cause of the investment's decline in value." *Id*.

Here, Plaintiffs have pleaded that Defendants made numerous misrepresentations related to 2U's relationships with Partner Institutions – particularly the 5-10 year contracts that were, according to analysts "critical to 2U". Compl. ¶ 65. The alleged misrepresentations related to 2U's relationships with its Partner Institutions. In fact, Defendant Paucek represented to investors and analysts on August 8, 2023, that "95% of degree revenue is under contracts….which renew after 2026." Compl. ¶ 99. The corrective disclosures came on November 9, 2023 (*Id*. ¶¶ 239-248) and February 12, 2024 (*Id* ¶¶ 249-251). These disclosures were directly tied to the alleged misrepresentations. The November 9, 2023 announcement that USC was exiting its partnership with 2U revealed to the market that 2U's relationships with its Partner Institutions were not "in a good place" (*Id*. ¶ 191) as Defendant Paucek told investors. Defendants' disclosure in February

29

12, 2024 that "there is substantial doubt about [2U's] ability to continue as a going concern[]" revealed to the market just how bad the relationships with Partner Institutions – the primary source of 2U's revenue – had deteriorated in the face of Defendants' many representations that the relationships were fine.

Defendants' argument that disappointing revenue earnings cannot serve as a corrective disclosure is misleading. Mot. at 30. The complaint alleges both disclosures were corrective because they revealed the information concealed by Defendants to the market – that 2U's relationships with major Partner Institutions were in trouble – not that the disappointing earnings revealed the fraud. ¶ 238. Further, Defendants' argument that Partner Institutions exiting their contracts with 2U had been "previewed" (Ex. 16 at 11), "disclosed" in February 2022 (Mot. at 5-6) is also misleading. It was not "changed economic circumstances, changed investor expectations, [or] new industry-specific or firm-specific facts" that caused the drop in stock prices, as Defendants would have the Court believe, but the revelation of the fact that 2U's "critical" Partner Institutions wanted out – a fact that had been concealed from the market. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005).

### D.  THE COMPLAINT PLEADS CONTROL PERSON LIABILITY

The Individual Defendants do not dispute that they are "control persons" of the Company, contending only that Plaintiffs fail to allege a primary violation.  (Mot. at 30.)  Because the Complaint alleges primary violations of § 10(b), as demonstrated above, it similarly states a claim for control person liability under § 20(a). *See Genworth*, 103 F. Supp. 3d at 790-91.

### IV.    CONCLUSION

Plaintiffs request that Defendant's Motion to Dismiss the Amended Complaint be denied.

Dated:  April 24, 2025

Respectfully submitted,


LEVI & KORSINSKY, LLP

s/ Nicholas I. Porritt
Nicholas I. Porritt (Bar No. 17078)
1101 Vermont Ave. NW Suite 800
Washington, DC 20005
Tel: (202) 524-4290
Fax: (212) 363-7171
Email: nporritt@zlk.com


*Attorneys for Lead Plaintiff Peter Gysbers*
*and Lead Counsel*

31