## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MICHAEL BEAUMONT, *individually and on behalf of all others similarly situated*,

    *Plaintiff*,

v.

CHRISTOPHER PAUCEK, *et al.*,

    *Defendants*

Case No. 24-cv-1723-ABA

## MEMORANDUM OPINION

Plaintiff Peter Gysbers has brought a securities class action against three officers of 2U, Inc., an online education company that works with colleges and universities to deliver content to students seeking online degrees. 2U filed for bankruptcy in July 2024. Plaintiff has sued on behalf of a putative class of investors who acquired 2U stock between February 9, 2022 and February 14, 2024 (the "Class Period"), alleging Defendants Christopher Paucek, Paul Lalljie, and Matt Norden made materially false and/or misleading statements to shareholders and investors about 2U's business. Defendants have moved to dismiss the amended complaint for failure to state a claim, which the Court will grant for the reasons that follow.

## I.   BACKGROUND

At the pleadings stage, the Court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). Plaintiff alleges as follows.

### A.    The Parties

2U is a publicly traded online education company incorporated in Delaware and headquartered in Maryland. ECF No. 41 ¶ 29. 2U's "stated objective is to work with [colleges and universities] to take their classes online and make high online learning accessible, scalable, and sustainable." *Id.* ¶ 37. "For a time," Plaintiff alleges, 2U "found success operating through two segments": (1) the Degree Program, which "delivers content, in partnership with established colleges and universities, to students seeking an online undergraduate or graduate degree," and (2) the Alternative Credentials segment, which "offers online open courses, boot camps, and micro-credential programs, also in partnership with colleges and universities, for shorter duration and lower-priced non-degree offerings." *Id.* ¶ 40.

2U went public in March 2014, raising $119 million at $13 per share. *Id.* ¶ 39. 2U went on to expand its offerings through strategic acquisitions of training programs and through partnerships with colleges and universities ("Partner Institutions"). *Id.* Part of 2U's business model has been based on U.S. Department of Education guidance regarding revenue sharing between higher education institutions and "online-program managers" ("OPMs"). Plaintiff alleges that although the Higher Education Act of 1965 prohibits "incentive compensation" for securing student enrollment or financial aid (other than with respect to international students), DOE guidance issued in 2011 "allow[ing] OPMs to bypass the ban [on incentive compensation based on enrollment] if they offer colleges additional services beyond recruitment, such as marketing or course design." *Id.* ¶¶ 41, 43. Plaintiff alleges that although "the law still prohibits paying bonuses or commissions to recruiters for securing enrollments, the OPM for-profit business model relies on revenue-sharing with nonprofit universities in exchange for

bundled services provided to students and the institution." *Id.* ¶ 43. 2U's Degree
Program "used a revenue sharing model where it typically took 60% of tuition fees from
Partner Institutions." *Id.* ¶ 44.

Christopher Paucek ("Paucek") was 2U's co-founder and CEO from 2012 until
November 16, 2023. *Id.* ¶ 26. Paul Lalljie ("Lalljie") was 2U's CFO from October 16, 2019
to November 16, 2023, at which point he replaced Paucek as CEO. *Id.* ¶ 27. Matt Norden
("Norden") is 2U's Chief Legal Officer, and has also served as CFO since replacing Lalljie
when he became CEO. *Id.* ¶ 28.

### B.    Factual Allegations

On November 16, 2021, 2U acquired edX, a nonprofit online course provider that
is considered "one of the world's most comprehensive 'free-to-degree' online learning
platforms," for $800 million. *Id.* ¶ 56-57. 2U, in making this acquisition, purportedly
"sought to leverage an industry-leading platform, to offer degrees, boot camps,
professional certificates, and free courses, all in one place and easily accessible to
millions of learners around the world." *Id.* ¶ 58. By consolidating its offerings onto a
single platform, 2U hoped to "reach a global audience and lower advertising costs." *Id.* ¶
56.

But to develop and build out the edX platform, 2U determined it would have to
provide more flexibility to Partner Institutions. *Id.* ¶ 58. In 2022, 2U updated its
revenue sharing model with a "Core Degree Bundle at 35% revenue share, which
includes program design, management, mark[eting], and student support." *Id.* ¶ 59.
Partner Institutions could then add additional services for higher revenue shares. *Id.* 2U
also "began to offer revenue sharing points for tuition reduction to encourage new and
existing Partner Institutions to lower the cost of their online degree programs." *Id.*

"Defendants heralded edX as a revolutionary platform that would improve 2U's business." *Id.* ¶ 62. For example, shortly after the edX acquisition in its FY 2021 Press Release on 2U's fiscal results for the fourth quarter of 2021[1], 2U stated that through "the addition of edX and our transition to a platform company, we have established a strategic and financial framework for achieving our midterm goals and creating shareholder value." *Id.* (emphasis omitted). And, at the time, "financial analysts were impressed by 2U and edX." *Id.* ¶¶ 63-65.

But Plaintiff alleges that, from early on after acquiring edX, "2U failed to invest the necessary resources to implement its platform strategy" and "edX had a challenging interface and generated poor prospects who had no intention of paying for any services." *Id.* ¶ 102. Throughout the Class Period, "Partner Institutions expressed concerns with 2U about the quality of its programs, enrollment numbers, and marketing efforts." *Id.* ¶ 85. 2U would hold weekly or bi-weekly meetings with its Partner Institutions, as well as quarterly and annual business reviews, "to monitor program enrollments." *Id.* ¶ 86. According to former employees, the quarterly and annual business reviews "became an opportunity for schools to 'air grievances,'" *id.*, and "Partner Institutions were realizing that they could provide online education programs on their own without 2U's services." *Id.* ¶ 87.

In particular, Partner Institutions expressed dissatisfaction with 2U's inability to increase enrollments as much as promised, and they were also concerned about 2U's decision to decrease its budget for marketing campaigns. *Id.* ¶¶ 88-91. One such example of a dissatisfied Partner Institution was the University of Southern California

---

[1] 2U's fiscal year appears to be aligned with the calendar year, e.g., FY2021 was January to December 2021.

("USC"), and a former employee made clear that Paucek "was a highly engaged executive who was very concerned about the USC program." *Id.* ¶ 96. Partner Institutions allegedly were disappointed with edX because it did not provide easily digestible content and did not adequately differentiate one school's offerings from another, *id.* ¶ 104, and the prospective students who were attracted to the edX platform were of "poor quality," *id.* ¶ 105. At the same time, the online education market, which had boomed during the COVID-19 pandemic, was changing. *Id.* ¶ 106. That, along with the Alternative Credential Segments starting to "cost[] too much to be profitable," led to 2U's alleged inability to be profitable. *Id.*

2U began to "sunset" contracts with Partner Institutions during 2023. *Id.* ¶¶ 123-126. On November 9, 2023, "[w]ithout warning . . . 2U and USC announced that they would wind down their 15-year partnership." *Id.* ¶ 118. USC agreed to pay almost $40 million for its withdrawal. *Id.* ¶ 119. USC's withdrawal from 2U's platform "occurred against a backdrop of media scrutiny over the degree programs operated by 2U, and the withdrawal of major educational technology companies like Pearson and Wiley from the online program management space as universities increasingly opted to offer their own online classes." *Id.* ¶ 120. That same day, in an earnings call (statements from which will be discussed in more detail below), Paucek and Lalljie described USC's withdrawal as "portfolio management activity." *Id.* ¶ 121. Paucek was replaced as CEO a week later. *Id.* ¶ 122.

On February 14, 2024, Lalljie and Norden led an analyst call during which they disclosed that, due to 2U's debt, "there is substantial doubt about [2U's] ability to continue as a going concern." *Id.* ¶ 127. On that call, 2U disclosed: (1) $88 million of revenue in 2023 from portfolio management activities, such as fees negotiated for early

partnership terminations; (2) 2023's full year revenue of $946 million, which was below the guidance 2U had provided in 2023 of $965 to $990 million; and (3) a substantially reduced revenue guidance for 2024 of $805 to $815 million. *Id.* ¶ 127. Norden also disclosed that "2U had already sold $75.9 million of receivables of the portfolio management activities for proceeds of $66.7 million." *Id.* ¶ 128. That day, 2U's share price fell $0.55 or 59.33% to close at $0.37 per share. *Id.* ¶ 129.

2U continued to struggle financially through the first half of 2024. *Id.* ¶ 138. It filed for Chapter 11 bankruptcy on July 25, 2024. *Id.*

## C.     Defendants' Alleged Misrepresentations and Omissions

Plaintiff alleges that, throughout the Class Period, Defendants made materially false and misleading statements to investors that conflict with what was known to be true by Defendants. The specific statements are described in § III.B below. Plaintiff alleges, generally speaking, that these statements were false and misleading when made for several reasons. First, Plaintiff alleges that beginning in 2022 and throughout the Class Period, "Defendants saw degree enrollments drop as 2U embraced edX and its new marketing framework." *Id.* ¶ 141. Second, "the anticipated savings from reducing marketing costs by using edX never materialized." *Id.* Third, "the mismatch between 2U's high-cost Degree Program and edX's largely international user base hindered success." *Id.* Fourth, "the flawed design of the edX platform made it hard for prospective users to find program offerings and for Partner Institutions to effective[ly] market their courses in Degree Program and Alternative Credential segments, including bootcamps." *Id.* Fifth, "2U's traditional marketing strategy was built around higher-priced programs . . . involving [of] 'bundled services' and this approach was unable to benefit the majority of edX's lower-priced or free course offerings," an approach that "was embodied by the

free to degree philosophy." *Id.* Sixth, "[a]fter acquiring edX, 2U decided to rely on the free to degree model to attract new students and reduce its marketing expenses" but "the leads this strategy generated did not bring new paying customers, which led to a decline in enrollments and revenue." *Id.* And lastly, "[w]hile the acquisition of edX expanded 2U's course offerings, many valuable longstanding contracts with Partner Institutions began to end through portfolio management activities, or negotiated early terminations." *Id.*

### D. Procedural History

On June 13, 2024, Plaintiff filed this case against Defendants as well as 2U. ECF No. 1. A month later, on July 30, 2024, 2U filed a notice informing the Court of the filing of a bankruptcy petition against 2U and requesting an automatic stay. ECF No. 7. Plaintiff thereafter filed a notice of voluntary dismissal with respect to 2U only, ECF No. 10, which the Court granted, terminating 2U as a defendant in this case. ECF No. 20. The Court thereafter appointed lead counsel and plaintiff in this case. ECF No. 30. Plaintiff filed an amended complaint on December 6, 2024. ECF No. 41 (the operative complaint). In February 2025, Defendants filed a motion to dismiss the amended complaint for failure to state a claim. ECF No. 42 (the "Motion to Dismiss"). Plaintiff responded to the motion, ECF No. 45, and Defendants replied, ECF No. 49. Defendants also filed a motion for the Court to take judicial notice of the exhibits attached to their Motion to Dismiss. ECF No. 44.

## II. PLEADING STANDARD FOR SECURITIES FRAUD CLAIMS

To withstand a motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative relief" by containing "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While a court reviewing a 12(b)(6) motion "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff," *King*, 825 F.3d at 212, bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a plausible claim. *Iqbal*, 556 U.S. at 679. When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6).

Prior to the passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), plaintiffs alleging securities fraud actions were subjected to the Rule 9(b) heightened pleading standard, requiring plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Congress, in passing the PSLRA, created a uniform system that further heightened the pleading requirements on plaintiffs alleging private securities fraud. *Public Employees' Retirement Ass'n of Colo v. Deloitte & Touche LLP*, 551 F.3d 305, 310-11 (4th Cir. 2009). As explained in greater detail below, "[t]he PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)). "If those exacting pleading requirements are not satisfied, the complaint must be dismissed." *Singer v. Reali*, 883 F.3d 425, 439 (4th Cir. 2018).

## III.    DISCUSSION

Plaintiff asserts two causes of action against Defendants: (1) violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, and (2) violations of § 20(a) of the Exchange Act. Defendants argue the Complaint fails to state a claim upon which relief can be granted under the applicable federal securities laws and their respective pleading standards.

### A.    Legal Standards

### i.    Section 10(b) of the Exchange Act and SEC Rule 10b-5

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5(b) makes it "unlawful," among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements . . . not misleading." 17 C.F.R. § 240.10b-5. A claim under Section 10(b) and SEC Rule 10b-5 has six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

### Material Misrepresentation

To allege that a defendant has made "a material misrepresentation or omission," a plaintiff "must point to a *factual* statement or omission—that is, one that is

demonstrable as being true or false." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 342-43 (4th Cir. 2003) (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999)). And that false factual statement "must concern a *material* fact." *U.S. S.E.C. v. Pirate Investor LLC*, 580 F.3d 233, 240 (4th Cir. 2009) (emphasis added) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). "[A] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Id.* (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999)).

Although an assertion framed as an "opinion" can be actionable, "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015). "'Opinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis.'"" *Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 387 (4th Cir. 2023) (quoting *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014)). Similarly, "'expressions of puffery and corporate optimism' generally do not constitute securities violations." *Id.* (quoting *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 153 (2d Cir. 2013)). That is because "not all self-promotion is actionable, nor does Rule 10b-5 exist to 'purge the market of all optimism.'" *Boykin v. K12, Inc.*, 54 F.4th 175, 183 (4th Cir. 2022) (quoting *Xia Bi v. McAuliffe*, 927 F.3d 177, 183 (4th Cir. 2019)). "The relevant standard is whether 'a reasonable investor, exercising due care, would gather a false impression

from a statement, which would influence an investment decision.'" *Id.* (quoting *In re Marriott Int'l, Inc.*, 31 F.4th 898, 901 (4th Cir. 2022)); *see, e.g., MacroGenics, Inc.*, 61 F.4th at 386 (concluding that statements by the defendant pharmaceutical company such as "we're very excited about being able to disclose additional data" and that "activity observed to date in [a clinical trial] is promising," in the context of those statements, were "textbook examples of puffing statements").

Congress also provided a safe harbor for "forward-looking statements . . . if and to the extent that" the statement is "(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial," or if "the plaintiff fails to prove that the forward-looking statement . . . if made by a business entity; was—(I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1). To plead an actionable forward-looking statement, plaintiffs must allege with particularity that defendants (1) had actual knowledge of the falsity of the statements, and (2) failed to issue "meaningful cautionary" language along with the statement. *Boykin*, 54 F.4th at 184.

### Scienter

The element of "scienter" requires plaintiffs to plead "specific facts showing a motive and opportunity to commit fraud . . . [that] may be relevant in demonstrat[ing] a strong inference of scienter." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 344 (4th Cir. 2003) (holding that recklessness or intent is required to plead scienter rather than negligence). With respect to the heightened pleading standard for scienter,

plaintiffs must "'state with particularity facts giving rise to a strong inference that the defendant acted' with intentional or reckless deception 'with respect to each act or omission alleged.'" *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 240-41 (4th Cir. 2023) (citing 15 U.S.C. § 78u-4(b)(2)(A)). Plaintiffs must therefore "raise a strong inference that Defendants intended to deceive them or created such a high risk of misleading them that Defendants must have known that they were being deceptive." *Id.* (citing *Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009)).

There are two steps to applying the heightened pleading standard for scienter. First, a court must consider the "inferences [of scienter] urged by the plaintiff." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007)). Then, the court must "weigh those inferences against competing inferences rationally drawn from the facts alleged, giving each only the inferential weight warranted by context and common sense." *Id.* (citing *Matrix Capital*, 576 F.3d at 183). Applying this comparative framework, a complaint adequately pleads scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

### ii.    Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act imposes joint and several liability against controlling persons or officers of a company that violates section 10(b) and SEC Rule 10b-5 "to the same extent as such controlled person" unless "the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "The liability of a control person under section 20(a) is derivative of—and dependent upon—liability of a controlled

person under section 10(b)." *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018).

Therefore, if a complaint fails to state a claim under section 10(b), it resultingly fails to

state a claim under section 20(a). *Id.*

### B.     Alleged Material Misstatements or Omissions

Defendants argue that Plaintiff has failed to plead any actionable misstatements.

ECF No. 42-1 at 18-30; ECF No. 42-2. The Court agrees for the reasons explained below.

And because Plaintiff has failed to allege any material misstatements or omissions, the

Court need not and does not reach the remaining elements required to state a claim

under Sections 10(b) and 20(a).

### i.     February 9, 2022 Statements

On February 9, 2022, 2U filed a press release with a Form 8-K reporting its

FY2021 financial results. *Id.* ¶ 142. The press release states in relevant part as follows.

(The bolding and italics in the quotes in the remainder of this section appear in

Plaintiff's complaint):

> Additionally, we completed our transformational acquisition
> of edX in the fourth quarter and its successful integration is a
> key priority for us. ***Our outlook for 2022 reflects a
> disciplined growth strategy and continued progress
> towards profitability***, which is prudent given the digital
> marketing environment. ***With the addition of edX and
> our transition to a platform company, we have
> established a strategic and financial framework for
> achieving our mid-term goals and creating
> shareholder value***.

*Id.* (emphasis in original). Paucek and Lalljie also hosted a conference call to discuss the

FY2021 financial results, and Paucek told investors:

> In this past November, we completed our acquisition of edX,
> one of the world's leading online education platforms. **With**

> **this industry-redefining combination, we've expanded our company to become one of the world's most complete online learning platforms and have gained a powerful driver of profitable growth and margin improvement.**
>
> In 2022, we plan on maintaining our commitment to profitability as we transform 2U into a leading education platform company with edX at the center, driving unmatched outcomes for millions of learners worldwide. We expect the 3 key drivers will improve our profitability in 2022: number one, **strength in our degree segment**; number two, international and enterprise expansion; and number three; scale and operational efficiency. Together, we believe these will deliver substantially improved performance to our bottom line while delivering meaningful growth.

*Id.* ¶ 144 (emphasis in original).

Plaintiff contends those statements were false or misleading because the launch of edX was "really rough at the start" as allegedly described by former 2U employees. ECF No. 45 at 14-15.

But as noted above, "the judiciary has long distinguished between mere puffing statements utilizing opinion and exaggeration to pitch a sale, on the one hand, and factual statements that constitute fraudulent misrepresentations, on the other." *Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004); *see also Longman v. Food Lion, Inc.*, 197 F.3d 675, 685 (4th Cir. 1999) (holding that Food Lion's statement of "[w]e believe that Food Lion's Extra Low Prices and its clean and conveniently located stores are especially well suited to the demands of our customers" were inactionable puffery that reasonable investors would not have relied upon). The statements made on February 9, 2022 that Plaintiff challenges fall squarely in the category of inactionable puffery. And to the extent Plaintiff argues that Paucek's statement in the February 9, 2022 earnings call,

14

ECF No. 41 ¶ 144, is more than mere "puffery," Plaintiff has nevertheless failed to adequately allege that it was false for him to state that, as of February 9, 2022 and early on in the timeline of 2U's acquisition of edX, 2U had "expanded . . . to become one of the world's most complete online learning platforms and [has] gained a powerful driver of profitable growth and margin improvement." *Id.*; *see Boykin* 54 F.4th at 183 ("[I]t is not actionable for a company to give positive descriptions of what it reasonably believes to be its strengths.").

### ii.   March 1, 2022 Statements

About a month later, on March 1, 2022, 2U filed its FY2021 Form 10-K with the SEC, which "underscored 2U's story as a growing company fulfilling its mission to help colleges and universities succeed in their digital transformation journeys." *Id.* ¶ 147. 2U's revenue increased 22% in FY2021 to $945.7 million. *Id.* The FY2021 Form 10-K stated the following:

> ***Our Degree Program Segment derives revenue primarily from contractually specified percentages of the amounts our university clients receive from their students in 2U-enabled degree programs for tuition and fees***, less credit card fees and other specified charges we have agreed to exclude in certain university contracts. ***Our contracts with university clients in this segment typically have terms of 10 to 15 years*** and have a single performance obligation, as the promises to provide a platform of tightly integrated technology and services that university clients need to attract, enroll, educate and support students are not distinct within the context of the contracts.

*Id.* ¶ 148 (emphasis in original). The FY2021 Form 10-K went on to identify certain risk factors including the Company's "ability to acquire new university clients and expand our degree programs, executive education offerings and boot camps with existing

university clients." *Id*. ¶ 149.

Plaintiff argues that "Paucek continued to stress the purportedly robust nature of 2U's customer base" and "consistently stressed that its contracts had terms of 10 to 15 years with limited termination rights." ECF No. 45 at 20-21. But Plaintiff has not adequately alleged falsity as to these statements. 2U's Form 10-K states that 2U "*typically*" has terms of 10 to 15 years in its contracts with university clients. ECF No. 41 ¶ 148 (emphasis added). And Plaintiff's arguments that "2U's relationships with Partner Institutions had in fact degraded" does not change the truthfulness of the statement that 2U's Degree Program Segment derives revenue at a set percentage of what the Partner Institutions receive. ECF No. 45 at 21.

To the extent Plaintiff alleges that the risk factors laid out in the Form 10-K are false, Plaintiff has not sufficiently pled falsity as to cautionary language either. ECF No. 41 ¶ 149.

### iii.    May 5, 2022 Statements

On May 5, 2022, 2U issued a press release announcing its fiscal results for January through March of 2022. *Id*. ¶ 152. The press release stated in relevant part:

> As we transition to a platform company under the edX brand, ***our partnerships help make institutions sustainable*** and help individuals unlock the livelihoods they want now and in the future.
>
>           *     *     *
>
> Paul Lalljie, 2U's Chief Financial Officer, added, "Our first quarter results demonstrated ***resilience in enrollments and revenue***, as well as continued improvement in operating efficiency. Based on these results and the outlook for key business drivers, we are affirming our revenue guidance and increasing our adjusted EBITDA guidance for

the full year. ***We remain focused on unlocking the
potential of edX, continuing to invest in our degree
programs, and improving the profitability of the
Alternative Credential Segment.***

*Id.* ¶ 153 (emphasis in original). Defendants held a conference call on the same day to
discuss 2U's quarterly earnings, and at that point 2U had "faced some challenges as
evidence[d] by the increased adjusted net loss from $9.9 million to $18.5." *Id.* ¶ 154. At
the same time, "the growth in both the Degree Program and Alternative Credential
Segments suggested continued demand for 2U's services." *Id.* Paucek told investors:

> **We're off to a great start on edX, but we have much
> more to do. We see 6 keys to unlocking the full
> potential of edX.org and cementing it as the
> preferred destination of choice for learners across
> the globe.**
>
> **Those 6 are: number one, traffic; number two, SEO
> and content publishing; number three, portfolio
> marketing versus single product marketing; number
> four, product evolution with stackable credentials;
> number five, white label opportunities and revenue
> model flexibility; and number six, new international
> channels and enterprise expansion.**

*Id.* (emphasis in original).

All of these statements constitute inactionable puffery because they are the kinds
of statements reflective of "[a]n enterprise in the process of raising capital [that] will
naturally seek to present itself in a positive light." *Boykin*, 54 F.4th at 183. Paucek and
Lalljie's statements that 2U has been demonstrating resilience, that 2U's partnerships
help make institutions sustainable, and that 2U is off to a great start on edX, are
"puffing statements utilizing opinion and exaggeration." *Dunn v. Borta*, 369 F.3d 421,
431 (4th Cir. 2004).

And as to Lalljie's statement that 2U "remain[s] focused on unlocking the potential of edX, continuing to invest in [its] degree programs, and improving the profitability of the Alternative Credential Segment," ECF No. 41 ¶ 153, Plaintiff has failed to adequately allege falsity as to the *specific claims* made in Lalljie's statement, because Plaintiff has not pled with particularity that 2U was in fact *not* focused on unlocking the potential of edX or improving profitability. Whether or not 2U was successful in doing so does not render false what Lalljie stated to investors on May 5, 2022.

### iv.    May 10, 2022 Statements

A few days later, on May 10, 2022, 2U filed its Form 10-Q for January through March of 2022 with the SEC. *Id.* ¶ 157. At that point, "2U's first quarter results showed growth in both its Degree Program and Alternative Credential segments, despite an increased net loss." *Id.* The Form 10-Q stated in relevant part:

> ***Our Degree Program Segment derives revenue primarily from contractually specified percentages of the amounts our university clients receive from their students in 2U-enabled degree programs for tuition and fees***, less credit card fees and other specified charges we have agreed to exclude in certain university contracts. ***Our contracts with university clients in this segment typically have terms of 10 to 15 years*** and have a single performance obligation, as the promises to provide a platform of tightly integrated technology and services that university clients need to attract, enroll, educate and support students are not distinct within the context of the contracts.

*Id.* ¶ 158 (emphasis in original). The Form 10-Q went on to identify certain risk factors including the Company's "ability to acquire new university clients and expand our degree programs, executive education offerings and boot camps with existing university

clients." *Id.* ¶ 159. Plaintiff has not adequately alleged falsity as to these statements for the same reasons as those applicable to the March 1, 2022 statements. *See supra* III.B.ii.

### v.    July 28, 2022 Statements

On July 28, 2022, 2U filed its Form 10-Q for April through June of 2022 with the SEC. *Id.* ¶ 163. The Form 10-Q stated the same about the Company's sources of revenue and contract duration as the Form 10-Q 2U filed for January through March of 2022:

> ***Our Degree Program Segment derives revenue primarily from contractually specified percentages of the amounts our university clients receive from their students in 2U-enabled degree programs for tuition and fees***, less credit card fees and other specified charges we have agreed to exclude in certain university contracts. ***Our contracts with university clients in this segment typically have terms of 10 to 15 years*** and have a single performance obligation, as the promises to provide a platform of tightly integrated technology and services that university clients need to attract, enroll, educate and support students are not distinct within the context of the contracts.

*Id.* ¶ 163 (emphasis in original). It also warned of the same risk factors, including 2U's "ability to acquire new university clients and expand our degree programs, executive education offerings and boot camps with existing university clients." *Id.* ¶ 164.

2U also held an earnings call to discuss these results, and at this point, "[t]he financial results were mixed as Degree Program segment revenue decreased by 2% and revenue from the Alternative Credential Segment grew by 8%" and "[n]et loss . . . increased by $41 million to $62.9 million." *Id.* Also at this stage of the acquisition, "Partner Institutions had issues with [the] edX platform and the new marketing strategy." *Id.* ¶ 174. During the earnings call, 2U "announced it would accelerate its transition to a platform company under the edX brand unifying product and marketing

19

strategy to create a comprehensive online learning marketplace, implementing a new marketing framework to increase efficiency, and simplifying the executive structure and reducing employee headcount." *Id.* ¶ 169. Paucek told investors:

> **Over the last 6 months, we've become increasingly confident in our platform strategy, which puts edX at the center as a unifying platform to drive high-quality learning outcomes. We're bringing together our universities, learners and enterprise partners into 1 platform, driving network effects to deliver our mission, deepen our strategic mode, drive sustainability and power long-term growth.**
>
> **During what was clearly a complicated quarter, our confidence in our platform strategy increased due to meaningful progress on various tactics we discussed on last quarter's call, including organic demand generation and the publishing platform of edX. As the quarter elapsed and the work progressed, we also realized that in order to really unlock this overall strategy, we need to fully reorganize our company around the edX platform. We do it to service to ourselves, our partners, our learners and our shareholders if we didn't go all the way into this platform transformation.**

*Id.* ¶ 170 (emphasis in original).

During the Q&A, "several analysts inquired about the effect of the transition to the edX platform on 2U's Partner Institutions." *Id.* ¶ 172. One investor asked "how 2U would be able to balance marketing spending appropriately to make sure that the Partner Institutions were getting the appropriate amount of marketing to drive those enrollments with the new free to degree strategy," to which Paucek responded that 2U "**would still drive individual program marketing but as we aggregate the activity under edX, all the boats will rise**." *Id.* ¶ 173 (emphasis in original).

Another analyst asked "how 2U would maintain the quality of its services while marketing as a platform and reducing headcount," *id.* ¶ 176, to which Paucek responded, "**[W]e're doing this in a way that we believe will not decrease quality, and that is of most concern to the company and to the management team. Quality has been our hallmark.**" *Id.* ¶ 177 (emphasis in original).

As to the Form 10-Q, Plaintiff has not adequately alleged falsity as to these statements for the same reasons as those applicable the March 1, 2022 statements. *See supra* III.B.ii. And the statements made by Paucek and in the accompanying earnings call constitute inactionable "opinion" statements that are "inherently subjective and uncertain assessments" about 2U's business trajectory. *See Boykin*, 54 F.4th at 183. Paucek's statements that "our confidence in our platform strategy increased," ECF No. 41 ¶ 170, "we've become increasingly confident in our platform strategy," *id.*, and "we're doing this in a way that we believe will not decrease quality," *id.* ¶ 177, are all statements that a reasonable investor would understand to convey personal beliefs rather than objective facts. *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 322 (4th Cir. 2019) (A "reasonable investor is expected to understand" an opinion statement "in its full context."). Plaintiff has alleged nothing to suggest that Paucek did not "actually hold[]" these beliefs. *See Omnicare*, 575 U.S. at 184.

Similarly, Plaintiff has failed to allege that Paucek's statement that 2U will continue to "drive individual program marketing" was false at the time the statement was made. And Paucek's statements that "all the boats will rise" and that "[q]uality has been our hallmark" are inactionable puffery for the reasons explained above.

### vi.    November 7, 2022 Statements

On November 7, 2022, 2U filed its Form 10-Q for July through September of

2022 with the SEC. *Id.* ¶ 181. The Form 10-Q stated the same as the previously filed

Form 10-Qs about the Company's sources of revenue and contract duration:

> ***Our Degree Program Segment derives revenue***
> ***primarily from contractually specified percentages***
> ***of the amounts our university clients receive from***
> ***their students in 2U-enabled degree programs for***
> ***tuition and fees***, less credit card fees and other specified
> charges we have agreed to exclude in certain university
> contracts. ***Our contracts with university clients in this***
> ***segment typically have terms of 10 to 15 years*** and
> have a single performance obligation, as the promises to
> provide a platform of tightly integrated technology and
> services that university clients need to attract, enroll, educate
> and support students are not distinct within the context of the
> contracts.

*Id.* ¶ 163 (emphasis in original). It also warned of the same risk factors, including 2U's

"ability to acquire new university clients and expand our degree programs, executive

education offerings and boot camps with existing university clients." *Id.* ¶ 164.

Along with its Form 10-Q filing, 2U issued a press release announcing the July

through September of 2022 financial results, stating in relevant part:

> ***"We completed our strategic realignment and***
> ***accelerated 2U's transition to a platform company***
> ***under the edX platform during the quarter,"*** said 2U
> Co-Founder and CEO Christopher "Chip" Paucek. "We
> realigned our organization around a single platform,
> ***streamlined our cost structure and implemented a***
> ***new, more efficient marketing framework.*** We believe
> these ***structural changes will not only strengthen our***
> ***bottom line,*** but also supercharge our ability to match
> millions of learners with accessible, best-in-class learning
> experiences from top institutions that help them advance
> their careers and transform their lives."
>
> ***Paul Lalljie, 2U's Chief Financial Officer, added,***
> ***"Our third quarter results demonstrate early***

> ***returns from our platform strategy and execution of
> our Strategic Realignment Plan.*** We delivered record
> adjusted EBITDA of $32.5 million, a 121% increase versus the
> prior year driven by ***improvements from both
> segments.*** As a result, we are increasing our adjusted
> EBITDA outlook for 2022 and remain committed to
> delivering further profitability improvements and positive
> free cash flow in 2023."

*Id.* ¶ 179 (emphasis in original).

2U held an earnings call on that same day to discuss the financial results and gave an investor presentation during that earnings call. *Id.* ¶ 184. The presentation contained the following slides:

## 2U Investment Thesis

**Investment Thesis**

- Industry-leader in >$36B global online higher education market[1]
- Leveraging 2U's **proprietary digital marketing** expertise to match a massive learner base with higher education offerings through **scalable** and **highly-ranked**[2] **edX platform**
- Expanding our market presence with **new offerings**
- Platform strategy **fundamentally improves efficiency** while enhancing **value proposition** to learners and partners
- Clear path to **increasing adjusted EBITDA, improving margins** and generating **sustainable cash flows**

 **Platform Strategy Drives Improved Efficiency**

**Actions & Accomplishments**

- Implemented new, more efficient marketing framework
- Leveraging edX platform domain authority
- Integrated entire 2U catalog onto edX
- Unified boot camps under edX brand
- Streamlined and simplified organization
- Expanded market presence

**Early Returns**

- Reduced annual run-rate operating expense by $70M
- Generated ~39% of organic leads from edX, which drives lower acquisition costs
- Reduced paid marketing spend by $26.5M YOY and $18.7M sequentially
- Reduced cost per lead by ~30% YOY
- Reduced marketing spend to ~41% of revenue



5

*Id.* During the conference call, Paucek told investors:

> **2U is transitioning most activity to the edX Platform, and we're seeing material progress internally and externally on the 3 things we talked about last quarter. First, we completed our organizational realignment, reducing our expense run rate by $70 million. Second, we implemented a new, more efficient marketing framework reflected in the $18.7 million reduction in variable/paid marketing spend from Q2 to Q3. Third, we launched more than 115 new open courses, professional certificates and micro**

> **credentials from 46 unique partners, signed multiple
> degree programs and brought 6 new corporate and
> university partners to the platform, including UC
> Riverside and Google Cloud. Total learners on edX
> also increased to over 46 million. These strategic
> shifts, combined with the muscle mass, i.e., domain
> authority of the edX Platform, puts us in a strong
> position to build on our profitability in 2023, bucking
> the challenging marketing realities that other
> companies and institutions are experiencing.**

*Id*. ¶ 189 (emphasis in original). During the Q&A session on the conference call, an

analyst asked Paucek about how 2U's transition impacts its relationships and contracts

with existing partners. *Id*. ¶ 190. Paucek responded:

> So in general [ ] full and flex will coexist. Somebody having a
> full program, the flex existing doesn't mean all of those
> schools are running to a flex program. That's not the case. Our
> partners understand, for the most part, if something is large,
> if it's a program that is really meaningful to the partner and to
> 2U, they understand that you can't get there without the scale
> that the paid marketing brings to the table. **We've got really
> stable partnerships across the board. Partners are in
> a good place.**

*Id*. ¶ 191 (emphasis in original).

First, as to the Form 10-Q, Plaintiff has not adequately alleged falsity as to these

statements for the same reasons as those applicable to the March 1, 2022 statements.

*See supra* III.B.ii.

Second, as to Paucek's statements made in the accompanying press release, these

statements are inactionable for several reasons. Paucek's statement that "[w]e believe

these structural changes will not only strengthen our bottom line," *id*., is an inactionable

opinion for the reasons explained above. *See supra* III.B.v. And as to Paucek's

statements that "[w]e completed our strategic realignment and accelerated 2U's

25

transition to a platform company under the edX platform during the quarter," ECF No. 41 ¶ 179, and "[o]ur third quarter results demonstrate early returns from our platform strategy and execution of our Strategic Realignment Plan," *id.*,[2] Plaintiff has failed to adequately allege falsity. Whether or not the strategic realignment was successful does not render untruthful the statement that Paucek was making at the time the statement was being made.

Third, as to 2U's Earnings Presentation and Paucek's accompanying statements in the Earnings Call, these statements too are inactionable for several reasons. The statements made by 2U in the Earnings Presentation are first labeled as an "investment thesis," and these statements are again not the type of statements upon which a reasonable investor would rely. Plaintiff has also failed to adequately allege falsity as to the statements in the Earnings Presentation and Paucek's accompanying statements in the Earnings Call at the time the statements were made. *See Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 213 (4th Cir. 1994) ("An inability to foresee the future does not constitute fraud.") (quoting *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1132 (7th Cir. 1993)); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) ("Plaintiffs cannot use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud.").

### vii.    November 29, 2022 Statements

A few weeks later, on November 29, 2022, Lalljie participated in a Q&A session at

---

[2] To the extent Plaintiff alleges this is a forward-looking statement, the PSLRA's safe harbor provision applies here and the statement is not actionable because Plaintiff has failed to allege that Defendants did not issue meaningful cautionary language along with the statement. *See* ECF No. 41 ¶ 182 (cautionary language in the July through September 2022 Form 10-Q).

Credit Suisse's 26th Annual Technology Conference. *Id.* ¶ 194. During an exchange about big changes happening at 2U, Lalljie said:

> **[O]ne of the things that we did in the summer was to accelerate that platform strategy. And by accelerating the platform strategy, we refer to it as we rip the Band-Aid off. We essentially instead of operating in silos, in lines of business, instead of having multiple marketing departments, instead of having multiple executive lead the business, consolidate, let the platform be the primary driver of our business. And to some extent, that has led to a significant reduction in cost. I mean, one may refer to that as synergies as you consolidate platforms and businesses together. And it is a strategic realignment that has truly allowed us to unlock value.**

*Id.* (emphasis in original).

For the same reasons as above with respect to Paucek's statements at the November 7, 2022 Earnings Call, *see supra* III.B.vi, Plaintiff has failed to allege that the statements were not true at the time Lalljie made them. For example, Lalljie's statement that letting the edX platform be the primary driver of the business had "to some extent . . . led to a significant reduction in cost," ECF No. 41 ¶ 194, is a backward-looking statement and Plaintiff has not explained what was false about that statement when it was made. The complaint falls short with respect to the rest of Lalljie's statements for the same reasons. *See In re Worlds of Wonder*, 35 F.3d at 1419. And Lalljie's last statement that consolidating the platform "is a strategic realignment that has truly allowed us to unlock value" is inactionable puffery for reasons already explained above.

### viii.  January 9, 2023 Statements

On January 9, 2023, 2U announced that it had entered into a refinancing agreement, "extending the maturity date from December 2024 to December 2026,

amending other terms, and securing approximately $127 million in new funding from

Greenvale Capital LLP and The Berg Family Trust through $147 million in principal

amount of 4.50% Senior Unsecured Convertible Notes due 2030." *Id.* ¶ 197. 2U

announced this refinancing in a press release that stated:

> "We are excited to start 2023 with this important first step to
> optimize our balance sheet," said 2U Chief Financial Officer
> Paul Lalljie. "The transactions announced today will provide
> us with the ***flexibility to execute on our platform
> strategy and further strengthen our global market
> position.*** We are grateful for the support we've received from
> our lenders and Greenvale throughout this process, which we
> believe is an indicator of the financial community's confidence
> in our business. Today, we are operating as a leaner, more
> agile company that remains fully focused on delivering cash
> flow and profitability."

> Mr. Lalljie continued, "***We continue to see returns from
> our platform strategy and the implementation of
> our Strategic Realignment Plan.*** As a result, today we
> affirm the full-year 2022 guidance we provided on our
> November 7, 2022 earnings call and reiterate the 2023
> adjusted EBITDA target provided on that call, as we continue
> to execute on our platform strategy."

*Id.* ¶ 199 (emphasis in original).

The January 9, 2023 statements by Lalljie in the press release about 2U's debt

refinancing are again statements that Plaintiffs have not adequately alleged were false at

the time they were being made. Lalljie's statement that the refinancing would provide

2U with "the flexibility to execute on our platform strategy and further strengthen [its]

global market position," *id.*, is a statement that, even if the refinancing did not end up

strengthening 2U's global market position, has not been alleged with particularity to

have been false when made. The same is true for Lalljie's statement that 2U "continue[s]

to see returns from [its] platform strategy and the implementation of [its] Strategic Realignment Plan." *Id.*

### ix.     February 21, 2023 Statements

On February 21, 2023, 2U filed its Form 10-K for October through December of 2022 with the SEC. *Id.* ¶ 201. The Form 10-K stated the same about the Company's sources of revenue and contract duration as the Form 10-Qs for the previous quarters of 2022:

> ***Our Degree Program Segment derives revenue primarily from contractually specified percentages of the amounts our university clients receive from their students in 2U-enabled degree programs for tuition and fees***, less credit card fees and other specified charges we have agreed to exclude in certain university contracts. ***Our contracts with university clients in this segment typically have terms of 10 to 15 years*** and have a single performance obligation, as the promises to provide a platform of tightly integrated technology and services that university clients need to attract, enroll, educate and support students are not distinct within the context of the contracts.

*Id.* ¶ 202 (emphasis in original). It also warned of the same risk factors, including 2U's "ability to acquire new university clients and expand our degree programs, executive education offerings and boot camps with existing university clients." *Id.* ¶ 203. Plaintiff has not adequately alleged falsity as to these statements for the same reasons as the March 1, 2022 statements. *See supra* III.B.ii.

### x.     March 21, 2023 Statements

On March 21, 2023, 2U held its Investor Day, which "provided a comprehensive overview of 2U's business strategy, financial performance, and future outlook" and featured presentations from key company executives. *Id.* ¶ 207-208. During his

introductory remarks, Paucek told investors:

> Our platform is building a large and durable mode to competition by putting 2U's engine under the hood of edX to create the most powerful online learning platform on the planet. It creates a flywheel in a virtuous cycle with partner and content growth or supply driven by learner growth or demand. We start with the world's most comprehensive free-to-degree portfolio, effectively matching learners with content to drive the flywheel. We have best-in-class learner and partner support services something that the result of the space typically does not have. **This creates high-quality online education at scale, combining the reach of edX with the enabling services of 2U.**

*Id.* ¶ 209 (emphasis in original). During the Q&A session, when analysts asked Paucek

and Lalljie about how 2U planned to address partner attrition, they said the following:

> **Christopher J. Paucek Co-Founder, CEO & Director The reason that that's notable, Jeff, particularly for someone that has your tenure with the company is that for a long time, we, 2U, Andrew and I were going to the institution to actually try to get the contract opened because we had signed exclusive arrangements. Now maybe we could have never launched the company if we didn't have exclusive arrangements. So we went to schools like Carolina and we said, you know what, we'd like to – we love you, but we'd actually like to see some other people as well that was very complicated. And so we had to open each contract, we had to renegotiate the contract. [...]**

> Defendant Lalljie: So Jeff, we – **the model assumes minimal changes. It does have some slight changes.** And keep in mind, the overall mix would be also different because we have 25 new launches of flex degrees going forward, and the rev share there is obviously very different. **But in terms of the traditional full launches, we assume a fraction of very small changes.**

*Id.* ¶ 210 (emphasis in original).

First, Paucek's statement that 2U's pivot to its free-to-degree strategy would "create[] high-quality online education at scale, combining the reach of edX with the enabling services of 2U," is inactionable puffery. *Boykin*, 54 F.4th at 183 ("[A] company may state that its offerings are 'well suited to the demands of [its] customers' without committing securities fraud.") (quoting *Longman*, 197 F.3d at 685). And as to Paucek and Lalljie's responses in the Q&A session explaining how 2U plans to address contract renewals for large-scale partners in the upcoming years, Plaintiff has again failed to allege falsity as to any of the statements made. Plaintiff alleges that "2U had already terminated some contracts in 2022 and the first six months of 2023 and was negotiating even bigger terminations later in 2023." ECF No. 45 at 19 (citing ECF No. 41 ¶ 99). But neither Paucek's nor Lalljie's answers in the Q&A contradict Plaintiff's point. Instead, both were openly talking about "slight changes" and that the contract renegotiation process "was very complicated." ECF No. 41 ¶ 210.

### xi.    April 26, 2023 Statements

On April 26, 2023, 2U issued a press release announcing its January through March of 2023 financial results, and it stated in relevant part:

> "Our platform strategy has contributed to these strong results, creating a sound financial foundation and setting the stage for ***future top-line growth and sustained value creation for our shareholders," added Paul Lalljie, 2U's Chief Financial Officer. "This leads us to affirm our revenue guidance and increase our adjusted EBITDA guidance for the full year."***
>
> Business Outlook for Fiscal Year 2023
>
> The company affirmed its revenue guidance provided on February 2, 2023 and updated its guidance for net loss and

adjusted EBITDA as follows:

- ***Revenue to range from $985 million to $995 million, representing growth of 3% at the midpoint***
- ***Net loss to range from $93 million to $87 million***
- Adjusted EBITDA to range from $157 million to $163 million, representing growth of 28% at the midpoint

*Id.* ¶ 212 (emphasis in original). At that point, 2U had reported a "6% decrease in revenue compared to the same quarter in 2022 and a decline in revenue from the Degree Program segment." *Id.* ¶ 213. 2U held a conference call on the same day where Paucek stated "**we're off to a really good start in 2023 as we execute the platform strategy and drive greater profitability and cash flow.**" *Id.* (emphasis in original). Plaintiff argues that these statements are actionable because "Defendants [] repeatedly affirmed 2U's guidance for revenue and adjusted EBITDA for 2023 despite the significant contract termination that was being undertaken at the same time." ECF No. 45 at 20.

Statements by Defendants reflecting that they believed 2U would meet the full year revenue guidance for 2023 are forward-looking statements because they constitute "statement[s] of future economic performance." 15 U.S.C. § 78u-5(i)(C); *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747, 774 (9th Cir. 2023) (holding that statements surrounding meeting the full year revenue guidance were forward-looking statements protected by the PSLRA's safe harbor); *Plymouth County Retirement Ass'n v. Advisory Board Co.*, 370 F. Supp. 3d 60, 95 (D.D.C. 2019) ("Plaintiffs must [ ] plausibly allege that Defendants knew" that it was likely for "the company to miss its revenue projections."); *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912,

930 (N.D. Cal. 2017) (holding that the revenue guidance statements are not actionable because "Plaintiff has not adequately established that" Defendant's statements were "knowingly false when made" and Defendant gave sufficient cautionary language).

Moreover, Defendants did issue meaningful cautionary language to accompany its statements in the affirmed revenue guidance and adjusted EBITDA for 2023. *See* ECF No. 42-18 at 8 ("These forward-looking statements are subject to a number of risks, uncertainties and assumptions that could cause actual results to differ materially from the results predicted, including, but not limited to…"); *Hillson Partners*, 42 F.3d at 218-19 ("It is well recognized that statements that include such cautionary language are usually not the stuff of which securities fraud claims are made." (internal citation omitted)).

In addition, Paucek's statement that he believed 2U was "off to a really good start" constitutes inactionable opinion and puffery for reasons already explained above. *See supra* III.B.i.

### xii.    April 28, 2023 Statements

Two days later, on April 28, 2023, 2U filed its Form 10-Q for January through March of 2023 with the SEC, which stated the same about 2U's sources of revenue and contract duration with university clients as previous Form 10-Qs:

> ***Our Degree Program Segment derives revenue primarily from contractually specified percentages of the amounts our university clients receive from their students in 2U-enabled degree programs for tuition and fees***, less credit card fees and other specified charges we have agreed to exclude in certain university contracts. ***Our contracts with university clients in this segment typically have terms of 10 to 15 years*** and have a single performance obligation, as the promises to provide a platform of tightly integrated technology and

> services that university clients need to attract, enroll, educate
> and support students are not distinct within the context of the
> contracts.

*Id.* ¶ 215 (emphasis in original). It also warned of the same risk factors, including 2U's "ability to acquire new university clients and expand our degree programs, executive education offerings and boot camps with existing university clients." *Id.* ¶ 216. Plaintiff has not adequately alleged falsity as to these statements for the same reasons as the March 1, 2022 statements. *See supra* III.B.ii.

### xiii.   August 8, 2023 Statements

On August 8, 2023, 2U issued a press release announcing its April through June of 2023 financial results, and it stated in relevant part:

> "***2U's platform strategy is thriving*** and delivering
> sustainable double-digit margins driven by content velocity,
> product innovation, marketing effectiveness and operational
> efficiency," said Christopher "Chip" Paucek, Co-Founder and
> CEO of 2U.
>
> [...]
>
> ***Notably, in 2024 we plan to nearly triple our new***
> ***degree launches*** compared to our highest launch year with
> at least 50 new, capital-efficient programs. ***We expect this***
> ***momentum to continue in future years given the***
> ***strength of our pipeline,*** popularity of our flex degree
> model, and promise of our flat fee model."
>
> \*          \*          \*
>
> [...]
>
> **Business Outlook for Fiscal Year 2023**
>
> The company reaffirmed its revenue guidance provided on
> February 2, 2023 and updated its guidance for net loss and
> adjusted EBITDA provided on April 26, 2023 as follows:

- ***Revenue to range from $985 million to $995 million, representing growth of 3% at the midpoint***
- ***Net loss to range from $225 million to $220 million***
- Adjusted EBITDA to range from $160 million to $165 million, representing growth of 30% at the midpoint

*Id.* ¶ 220 (emphasis in original). On the same day, 2U filed its Form 10-Q, which stated the following regarding 2U's sources of revenue and contract duration with university clients:

> In our Degree Program Segment, ***we derive substantially all of our revenue from revenue-share arrangements with our university clients*** under which we receive a contractually specified percentage of the amounts students pay them to enroll in degree programs. ***Our contracts generally have 10 to 15 year terms and do not include termination rights for convenience.***

*Id.* ¶ 221 (emphasis in original). The Form 10-Q warned of risk factors regarding 2U's "ability to acquire new clients and expand [its] offerings with existing university clients." *Id.* ¶ 222. At this stage, 2U's revenue had decreased 8% to $222.1 million compared to the second quarter of 2022, and 2U's Degree Program segment revenue declined 16% to $119.5 million. *Id.* ¶ 225. Marketing expenses as a percentage of revenue also dropped by 9% and the edX platform was only generating 44% organic leads. *Id.*

On the same day, 2U hosted a conference call in which Paucek said the following:

> **We believe the business is moving strongly in the right direction due to our platform strategy. As a result, we're increasing our bottom-line guidance for the full year while reiterating our top line. We did have some revenue shift from Q2 to later in the year, something Paul will cover in detail.**
>
> **To deliver this strategy, we must continuously**

> **evaluate our current portfolio of offerings and at times, exit programs that do not fit. We've managed our portfolio in this manner for a few years now, and we've discussed some of those in the past, and we'll continue rotating the dial towards evolving student needs.**

*Id.* ¶ 226 (emphasis in original). Lalljie went on to say:

> **As part of our portfolio management efforts, in the second quarter, we expected to finalize agreements to sunset certain programs. However, these were pushed into the second half of the year. These agreements would have generated revenue in the Degree Program Segment in the second quarter. Now let's take a look at cost and expenses.**
>
> *            *            *
>
> **There are numerous indications of this, including the momentum in content velocity, the growth in organic leads, the significant marketing efficiencies, enterprise growth and the strong demand we're seeing for our flex Degree offerings. We are on track to meet and perhaps beat our 2023 financial goals while optimizing our degree portfolio and rolling out new program options for our partners. All of which is building a more competitively differentiated, resilient business for the future of education and positioning the company to deliver continued improvement in profitability and cash flows.**

*Id.* ¶ 227 (emphasis in original).

During the Q&A session, several analysts asked about 2U's relationships with its

Partner Institutions, to which Paucek gave the following responses:

> Defendant Paucek: Yes, Jeff, I mean, we're continually pretty much never not in some kind of discussion or negotiation with our clients. **We do have a very, very substantial percentage of the revenue locked**. I'm going to – I'll get

the number for you before we're done with the questions. **Existing contracts represent – it's like greater than 90% of our revenue through – nonetheless, it's – we do feel very confident in the current client relationships and our ability to navigate new – moving people to flex, in some cases** . . . So feeling really very positive about the existing client base.

[...]

Defendant Paucek: **So we've been doing this for some time now. We thought it was important to call it out so that people understand that this is like – it's going to be an ongoing process of us gradually rotating the business to something that we think fits the long-term value more strongly both for students, probably most importantly but also for our shareholders.**

[...]

**Defendant Paucek: Yes. So in certain cases, there's a contractual arrangement that we expected in the forecast. And in this particular case, it's moved into the back half of the year. It's that simple. So these are negotiated agreements, Jeff.**

[...]

Defendant Paucek: **Yes. I mean, Jeff, there's obviously a lot in a forecast. So there's a lot of puts and takes in the forecast. We've done this for some time. You might remember, Jeff, in particular, the Simmons undergrad program. That we talked with you in particular, quite a bit about. So the – with Simmons on ground, that's an example upon where you did have a substantial impact in that current period. We've had some of these in the first 6 months of the year. We will continue to have them. So unfortunately, we had multiple universities in play on this, and it's a shift. But we feel very confident in our ability to manage them overall, and we like the mix that we're moving to.**

*Id.* ¶ 230 (emphasis in original).

At the outset, Defendants' statement reaffirming the revenue guidance and adjusted EBITDA in the Q2 2023 press release is a forward-looking statement protected by the PSLRA's safe harbor for the reasons explained above with respect to Defendants' statement on April 26, 2023. *See supra* III.B.xi. And as to the statements contained in the Form 10-Q, Plaintiff has not adequately alleged falsity as to these statements for the same reasons as the March 1, 2022 statements. *See supra* III.B.ii.

Plaintiff then takes issue with several statements made by Paucek and Lalljie in the accompanying earnings call about how they "believe the business is moving strongly in the right direction," ECF No. 41 ¶ 226, that 2U "did have some revenue shift from Q2 to later in the year," *id.*, that 2U "must continuously evaluate [its] current portfolio of offerings and at times, exist programs that do not fit." *Id.* These statements are inactionable opinion statements or otherwise statements where Plaintiff has failed to adequately allege falsity. *See In re Marriott*, 31 F.4th at 902 (holding that, with respect to the complaint, "the facts it alleges do not contradict [defendant's] public disclosures") (*quoting Teachers' Ret. Sys. Of La. v. Hunter*, 477 F.3d 162, 182 (4th Cir. 2007)). Plaintiff has not alleged that Lalljie and Paucek did not actually hold these opinions at the time they were made. Even if Plaintiff's argument that "at the time Paucek was reassuring investors, the Partner Institutions on which 2U's revenue depended were already in the process of disengaging with 2U," ECF No. 45 at 21, were taken to be true, this information *was* disclosed to investors and therefore it is unclear how Plaintiff would have reasonably relied on optimistic statements (albeit, possibly naïve) by Defendants that the platform strategy was working.

Similarly, Plaintiff has failed to allege falsity as to Lalljie's statement that 2U

"expected to finalize agreements to sunset certain programs" but "were pushed into the second half of the year," ECF No. 41 ¶ 227, or Paucek's statement that the negotiated agreements have been "moved into the back half of the year," *id.* ¶ 230. The rest of Lalljie's statement about why these agreements were pushed back are inactionable opinion statements by Lalljie explaining his reasoning for why he believes this delay occurred. *Id.* And his statement that "[a]ll of which is building a more competitively differentiated, resilient business" is again puffery "utilizing opinion and exaggeration to pitch a sale." *Dunn*, 369 F.3d at 431.

*    *    *    *

Plaintiff has accordingly failed to state claims under Section 10(b) or Rule 10b-5 because Plaintiff has failed to plead any actionable misstatements or omissions made by Defendants or 2U. And assuming Paucek, Lalljie, or Norden had sufficient "control" over 2U such that they could be held liable under Section 20(a) for any of the alleged securities fraud violations by 2U, because the Court finds that Plaintiff has failed to plead such violations, Defendants cannot be held liable, vicariously or otherwise.

## IV.    CONCLUSION

For the foregoing reasons, the Court will GRANT the Motion to Dismiss and dismiss this case without prejudice. A separate order follows.


Date:  August 29, 2025                          _____/s/_____
                                                Adam B. Abelson
                                                United States District Judge